**A.R. Peter LaFOND, Plaintiff–Appellant,**

v.

**GENERAL PHYSICS SERVICES CORPORATION, Defendant–Appellee.**

**No. 228, Docket 94–7222.**

United States Court of Appeals, Second Circuit.

Argued Oct. 7, 1994.

Decided March 17, 1995.

Gregg D. Adler, Hartford, CT (Anne Goldstein, Gould, Livingston, Adler & Pulda, Hartford, CT, of counsel), for plaintiff-appellant.

Felix J. Springer, Hartford, CT (William G. Madsen, Day, Berry & Howard, Hartford, CT, of counsel), for defendant-appellee.

Before: FEINBERG, PIERCE, and MAHONEY, Circuit Judges.

PIERCE, Senior Circuit Judge:

Plaintiff A.R. Peter LaFond appeals from a judgment entered on February 17, 1994 in the United States District Court for the District of Connecticut (Alfred V. Covello, *Judge*), granting summary judgment in favor of defendant General Physics Services Corporation ("General Physics"). LaFond brought this action under Conn.Gen.Stat. § 31–51m, Connecticut's whistleblower protection statute, alleging that he was wrongfully terminated from his employment at General Physics for reporting suspected violations of federal law to state and federal agencies. Section 31–51m provides in pertinent part:

(b) No employer shall discharge ... any employee because the employee ... reports, verbally or in writing, a violation or a suspected violation of any state or federal law or regulation ... to a public body.... The provisions of this subsection shall not be applicable when the employee knows that such report is false.

The district court, applying the analytical framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), granted summary judgment in favor of General Physics on the grounds that: (1) LaFond failed to make out a prima facie case of retaliatory discharge under § 31–51m(b); (2) assuming, *arguendo*, a prima facie case was made out, General Physics articulated a legitimate, non-retaliatory reason for LaFond's discharge; and (3) LaFond failed to establish that General Physics' stated reason for discharging him was a pretext concealing a retaliatory motive. Alternatively, the court found that LaFond was not entitled to whistleblower protection because § 31–51m(b) imposes a requirement

of good faith, which it concluded LaFond lacked. On appeal, LaFond argues that summary judgment was inappropriate because, first, the court did not evaluate the evidence in accordance with the proper standards for deciding summary judgment motions because the court made findings of fact and drew inferences from the evidence in favor of the moving party, rather than determining whether genuine issues of material fact had been raised; second, the court erred in applying the analytical framework set forth in *McDonnell Douglas* instead of the standards enunciated in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), since there was direct evidence of a retaliatory motive; and third, the court erred by imposing a requirement of good faith under § 31–51m(b). For the reasons below, we conclude that summary judgment was improperly granted, and we vacate the judgment and remand for further proceedings.

## BACKGROUND

General Physics is a consulting firm that provides training, engineering and technical support services to clients in industry and the federal government, primarily federal agencies involved in defense. LaFond was discharged from his position as a program manager at General Physics' Groton, Connecticut facility effective April 30, 1992.[1] The events precipitating his discharge are as follows.

On March 17, 1992, the president of General Physics, David L. Thames, received an anonymous letter dated March 6, 1992, in which several allegations of improper conduct were made against a department head at General Physics' Groton facility, Robert F. Urso.[2] The letter, which LaFond later admitted was sent by him, purported to be from "a group of concerned employees" who

wished to inform Thames of "illegal, immoral, and unethical activities" allegedly engaged in by Urso. It characterized Urso as "a thief, a lier [sic], a cheat, and a man who commits crimes," and levelled several specific claims of wrongdoing and criminal misconduct against him, including charges of theft of government documents, theft of personal correspondence, a security violation, equal employment opportunity and company policy violations, sexual harassment, conflict of interest, and illegal contract charges. The names of several present and former employees were listed as having personal knowledge of the allegations. The letter also stated that if Urso was removed from his position or a similar action was taken against him within twenty-four hours, the authors would drop the matter entirely. It further threatened that if action was not taken, the authors would report Urso's alleged improprieties to a number of government authorities and valued clients that were listed in the letter.[3]

Thames took no action against Urso within twenty-four hours, and assumed that by not doing so, the authors had sent copies of the letter to the stated government authorities. Thames immediately launched an investigation into the claims to determine if there was any validity to the charges of wrongdoing by Urso. On March 19, 1992, Thames and Dennis R. Bunty, a vice-president at General Physics, met with Urso, who denied the charges. Thames then directed Bunty to meet with several current employees who were identified in the letter to determine if they could provide support for any of the claims.

On March 20, 1992, Bunty interviewed several current employees, including LaFond. He instructed each employee to complete a questionnaire that asked whether the employee knew anything concerning any of the

---

1. LaFond was initially hired as a systems analyst in 1986 by General Physics' predecessor. When General Physics later absorbed the company that had hired him, LaFond was re-hired in the same position. He was promoted to the position of program manager effective March 18, 1992, and remained in that position until his discharge.

2. We set forth the letter in its entirety in Appendix A.

3. Two documents were attached to the letter. The first was General Physics' mission statement describing the company's commitment to quality work and the honest and ethical behavior of its employees. The second was a four-year old letter of complaint against General Physics written by a former employee with whom LaFond was not acquainted.

allegations set forth in the letter. LaFond answered "no" to each question, and provided no supporting evidence in support of any of the claims against Urso. The other employees answered "no" to virtually every question, with the exception of a few positive responses concerning alleged sexual harassment by another employee not mentioned in the letter; and two positive responses by employees Cheryl Galloway and Rocky Stone regarding a request to shred a secret document made by either Urso or by an ex-employee mentioned in the letter, Bob Rose. LaFond's allegation regarding a security violation concerned this "secret" document.

On March 23, 1992, after speaking with his attorney, LaFond mailed copies of the letter to the Naval Underwater Systems Center ("NUSC") and the Connecticut Department of Labor ("CDOL"), at least in part for the purpose of obtaining whistleblower status.[4] On March 24, 1992, LaFond informed Bunty that he was the sole author of the letter and had mailed copies to the NUSC and CDOL. Thames and Bunty then met with LaFond to discuss the charges. LaFond proceeded to iterate several of the facts upon which he premised his claims and the names of several present and former employees whom he alleged had knowledge of the events. He also stated that he possessed a document that had been faxed to him by Urso directing him to destroy a secret document; he refused, however, to hand it over.

Interviews were subsequently scheduled with several current employees whom La-Fond had indicated would corroborate some of his allegations. Each employee was presented with verbatim excerpts of the claims contained in the letter. The employees largely denied having any direct knowledge of most of the allegations. However, as to the claim involving the security violation, Galloway stated that she was the security officer at the time of the incident, and that a secret document had been discovered approximately five years earlier. She stated that after conferring with Urso, she received an anonymous fax suggesting that she destroy the document. Two other employees, Stone and Judy Chown, testified that Rose, not Urso, was the person involved in the incident concerning the fax. As to the charges about theft of government documents, Galloway stated that although she had no direct knowledge, she had previously heard a "rumor." Additionally, one employee, Sita Edmond, indicated that as to the claim concerning theft of personal correspondence, LaFond had told her that he had heard that Urso was "sneaking into people's desks," but did not mention any specific events. Thames concluded that none of these individuals corroborated any of the charges of wrongdoing by Urso, and on March 31, 1992, met with LaFond and informed him that although he was willing to believe LaFond's story, there was absolutely no evidence supporting his claims of wrongdoing by Urso. LaFond was given another opportunity to offer support for his charges. He responded that he expected negative responses from the interviewed employees because they were fearful of losing their jobs. He also offered to take a lie-detector test, which offer was refused.

On April 16, 1992, LaFond was placed on administrative leave with pay. Bunty explained that although he believed that La-Fond believed the allegations, the investigation revealed no evidence that corroborated

4. The letter to the NUSC, which was identical to the letter to the CDOL, provided:

> 83 Leafwood Lane, Suite 219
> Groton, CT 06340
> March 23, 1992
> Commanding Officer
> Naval Underwater Systems Center
> New London Laboratory
> New London, Ct.
> Re: Attached dtd [sic] March 6, 1992
> Dear Sir:
> I am an employee of General Physics Services Corporation, 481 Gold Star Highway, Groton[,] Ct. 06340. I am sending you the attached for the purpose of disclosing what I believe to be improper business practices by the management of my company.
> I am hopeful that you will investigate these allegations and inform me of the results. I am very fearful of loosing [sic] my job but the allegations I bring forth are true. I will speak to whomever necessary regarding this matter.
> If you wish to contact me, I may be reached at my office at 449–1313 between 7AM and 5PM, or at my home, 445–4926 after 5PM.
> Sincerely,
> /s/ *A.R. Peter LaFond*

the charges against Urso. LaFond was again invited to provide any evidence supporting his claims. He responded that he stood by the truth of what he had said, and again offered to take a lie-detector test. However, on April 30, 1992, Bunty sent a letter to LaFond discharging him. The stated reasons for LaFond's discharge were:

As you are aware, you mailed a letter on March 6, 1992 that has precipitated an unpleasant chain of events. Your letter, at first anonymous and later acknowledged, alleged that [Urso] ... had committed various unprofessional and illegal acts. You have not provided us with any evidence to support your accusations and we have been unable to uncover any evidence supporting those accusations through our own investigation. In the course of that investigation, you made statements that were inconsistent, suggesting that you may have knowingly made false statements. The employees whom you identified as witnesses or corroborators have not provided any support for your allegations. Both [Thames] and I have repeatedly asked you to provide any evidence that would support your allegations and you have failed to do so. There appears to be no evidence to support your accusations. Accordingly, it appears that you have acted recklessly and not in the best interest of [General Physics] by defaming a co-worker....

The fact that you threatened to mail these unsupported charges to the [NUSC] and other parties in an attempt to coerce [General Physics] into discharging [Urso], and did in fact eventually mail these unsubstantiated allegations to at least the [NUSC], causes to [sic] question your judgement and reliability.

Thereafter, LaFond filed a complaint against General Physics in Connecticut Superior Court, alleging, *inter alia*, that he was terminated from his employment at General Physics in violation of § 31–51m(b) for reporting suspected violations of federal law to state and federal agencies. The action was removed to the district court on the basis of diversity jurisdiction, and General Physics moved for summary judgment. The evidence before the court presented through affidavits, deposition testimony and testimony given at a prejudgment hearing, established, *inter alia*, the following undisputed facts. First, LaFond admitted that he misled Bunty during the investigation; he explained, however, that he responded negatively on the questionnaire because he felt that Bunty was not conducting a meaningful investigation, but was instead on a "witch hunt" to determine who wrote the letter. Second, LaFond did not dispute that his allegations were not supported by the employees who were interviewed, or that he never provided Thames with any concrete evidence in support of his claims. Third, the record contained substantial testimony indicating that LaFond believed most, if not all, of the allegations to be true. Fourth, Thames and Bunty conceded that they felt that LaFond personally believed his claims. Fifth, Thames admitted that he found "kernels of truth" woven throughout the allegations, but that he found no evidence other than LaFond's own assertions to support the charges against Urso. Sixth, although LaFond's letter mentioned several former employees whom he claimed could substantiate his claims, the investigation was conducted with current employees only. Seventh, when asked why LaFond was terminated, Thames testified:

The reasons why I terminated [LaFond] ... are quite straightforward. [LaFond] sent me a, I felt like I mean a threatening, extortionate letter that basically said we're not looking for justice or information, we want [Urso] out of here.

If you don't do what we tell you ... this letter is going to be sent to everyone. I feel like he put me in a terrible position. He put this company in a terrible position, and he was taking actions to, I felt, recklessly endanger the career of one of our employees without any substance or any evidence.... I mean that is the most straightforward way I can be as to why he was terminated.

On February 16, 1994, the district court issued an order granting General Physics' motion for summary judgment. *LaFond v. General Physics Servs. Corp.*, No. 2:92CV571, slip op. (D.Conn. Feb. 16, 1994).

Since Connecticut courts had not yet described the legal framework applicable to claims under § 31–51m(b), the court presumed that they would look to federal employment discrimination law for guidance, and applied the analytical framework set forth in *McDonnell Douglas,* concluding that: (1) LaFond failed to make out a prima facie case of retaliatory discharge under § 31–51m(b); (2) assuming, *arguendo,* a prima facie case was made out, General Physics articulated a legitimate, non-retaliatory reason for LaFond's discharge; and (3) LaFond failed to establish that General Physics' stated reason for discharging him was a pretext concealing a retaliatory motive. The court further ruled that even if LaFond could sustain his claim under the *McDonnell Douglas* test, summary judgment was nonetheless warranted because § 31–51m(b) imposes a requirement of good faith, which it concluded LaFond lacked. Judgment was entered on February 17, 1994, and this appeal followed.

## DISCUSSION

### A. *Summary Judgment*

LaFond's principal argument on appeal is that the district court's grant of summary judgment in favor of General Physics was improper because the court did not evaluate the record evidence in accordance with the proper standards for deciding summary judgment motions. Specifically, LaFond argues that the court usurped the function of the jury by making findings of fact and drawing inferences from the evidence in favor of General Physics, rather than determining whether genuine issues of material fact had been raised. Upon carefully reviewing the court's decision and the materials relied upon, we agree.

■ The general principles applicable to summary judgment motions are familiar and well-settled. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby,*

*Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment, *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987); *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir. 1975), and in assessing the record to determine whether there is a genuine issue as to any material fact, the trial court is required to resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *Gallo,* 22 F.3d at 1223; *Donahue,* 834 F.2d at 57. "The inferences to be drawn from the underlying facts revealed in materials such as affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994); *accord Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202–03 (2d Cir. 1995); *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989).

■ "[T]he trial court's task at the summary judgment motion stage ... is carefully limited to discerning whether there are any genuine issues of material fact to be tried, *not* to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo,* 22 F.3d at 1224 (emphasis supplied); *see also Donahue,* 834 F.2d at 58 (it is a fundamental maxim that "on a motion for summary judgment a court 'cannot try issues of fact; it can only determine whether there are issues to be tried.'") (quoting *Heyman,* 524 F.2d at 1319–20). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers,* 43 F.3d at 37; *accord Cronin,* 46 F.3d at 203. In reviewing a grant of summary judgment, we are governed by the same principles and we review the record *de novo. Cronin,* 46 F.3d at 203; *Gallo,* 22 F.3d at 1224.

Before discussing the merits of LaFond's summary judgment argument, we briefly address his contention that the district court erred in refusing to analyze this case in accordance with the standards set forth in *Price Waterhouse.* The district court presumed that Connecticut courts would look to federal employment discrimination law for guidance in analyzing claims under § 31–51m(b), and applied the three-part burden shifting analysis set forth in *McDonnell Douglas. See generally St. Mary's Honor Ctr. v. Hicks,* — U.S. —, —– —, 113 S.Ct. 2742, 2747–48, 125 L.Ed.2d 407 (1993); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *McDonnell Douglas,* 411 U.S. at 802–04, 93 S.Ct. at 1824–25. The court applied this analysis without addressing LaFond's arguments that the analytical framework stated in *Price Waterhouse, see* 490 U.S. at 258, 109 S.Ct. at 1795 (plurality opinion) ("when a plaintiff in a Title VII case proves that her gender played a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's gender into account"), was the proper approach because there was direct evidence of a retaliatory motive, namely, the discharge letter specifically mentioned LaFond's reporting of the suspected violations to the NUSC. *See Miko v. Commission on Human Rights & Opportunities,* 220 Conn. 192, 204–05, 596 A.2d 396, 403 (1991) (when a plaintiff presents direct evidence of discrimination, the *McDonnell Douglas* formulation does not apply; rather, such cases are analyzed under the standards enunciated in *Price Waterhouse* ); *Levy v. Commission on Human Rights & Opportunities,* 35 Conn. App. 474, 482, 646 A.2d 893, 897 (1994) (same); *see also Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1180–86 (2d Cir.) (discussing the differences between "pretext" cases which apply *McDonnell Douglas,* and "mixed-motive" or "direct evidence" cases which apply *Price Waterhouse* ), *cert. denied,* — U.S. —, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). On appeal, LaFond argues that the court's application of *McDon-*

*nell Douglas* and the failure to even address the issue of the applicability of *Price Waterhouse,* were erroneous.

■ In the manner in which we decide this appeal, we find it unnecessary to determine whether there was direct evidence of retaliatory conduct sufficient to trigger *Price Waterhouse,* because we conclude that summary judgment was improperly granted to General Physics even under the more favorable standard (to General Physics) of *McDonnell Douglas.* Since we limit our decision herein to a determination of whether the district court failed to follow the proper standards for deciding a summary judgment motion, we do not think it crucial how the court categorized the case, at least at this stage of the litigation. We do note, however, that we find no error in the court's application of federal employment discrimination standards to a claim of retaliatory discharge under § 31–51m(b). We believe that Connecticut courts would refer to these well-established principles in the absence of authority to the contrary. *See Miko,* 220 Conn. at 202, 596 A.2d at 402 (applying federal employment discrimination standards to a claim of housing discrimination under Connecticut law); *Levy,* 35 Conn.App. at 480, 646 A.2d at 896 ("We look to federal employment discrimination law for guidance in enforcing our own antidiscrimination statute."); *see also Stevens v. St. Louis Univ. Medical Ctr.,* 831 F.Supp. 737, 741 (E.D.Mo.1993) (in the absence of cases setting forth the elements of a whistleblower claim under Missouri law, the court applied the *McDonnell Douglas* standards); *Rosen v. Transx Ltd.,* 816 F.Supp. 1364, 1369–70 (D.Minn.1993) (analyzing Minnesota's whistleblower statute under the *McDonnell Douglas* test).

■ In general, the requirements of proof under *McDonnell Douglas* "must be tailored to the particular facts of each case." *Miko,* 220 Conn. at 204, 596 A.2d at 403. In an action under § 31–51m(b), the plaintiff would have the burden at the outset of proving by a preponderance of the evidence a prima facie case of retaliatory discharge as defined under the statute. *See, e.g., Hicks,* — U.S. —, 113 S.Ct. at 2746–47; *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093;

*McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1038 (2d Cir.1993). Once the plaintiff has presented a prima facie case, the defendant would have the burden of articulating a legitimate, non-retaliatory reason for its action. *See, e.g., Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093; *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Cosgrove,* 9 F.3d at 1039. If the defendant is able to articulate such a reason, the plaintiff would have an opportunity to show that the reason was merely a pretext for retaliation. *See, e.g., Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093; *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825. The ultimate burden of persuading the trier of fact that the defendant violated § 31–51m(b) would remain at all times with the plaintiff. *See, e.g., Hicks,* —— U.S. at —— –——, 113 S.Ct. at 2747–48; *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093; *Cosgrove,* 9 F.3d at 1039. The district court granted General Physics' motion for summary judgment based on its finding that "the evidence fail[ed] to determine these issues in the plaintiff's favor." *LaFond,* No. 2:92CV571, slip op. at 1. We now turn to the court's application of *McDonnell Douglas* to the facts of this case to determine if summary judgment was indeed appropriate.

### 1. *LaFond's Prima Facie Case*

■ LaFond's first burden under the *McDonnell Douglas* scheme is to establish a prima face case of retaliatory discharge under § 31–51m(b). To establish a prima facie case, LaFond must show (1) that he engaged in a protected activity as defined by § 31–51m(b); (2) that he was subsequently discharged from his employment; and (3) that there was a causal connection between his participation in the protected activity and his discharge. *See, e.g., Wolcott v. Champion Int'l Corp.,* 691 F.Supp. 1052, 1058 (W.D.Mich.1987) (stating elements of prima facie case under the Michigan Whistleblowers Protection Act); *Melchi v. Burns Int'l Sec. Servs., Inc.,* 597 F.Supp. 575, 582 (E.D.Mich.1984) (same). The nature of LaFond's burden of proof at the prima facie stage is *de minimis. Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir. 1988).

■ There is no dispute herein that LaFond established the first two elements of his prima facie case. He reported suspected violations of federal law to the NUSC and CDOL, and he was subsequently discharged. We pass then to whether LaFond demonstrated that his discharge occurred in circumstances giving rise to an inference that he was discharged because he reported the suspected violations to the NUSC and CDOL. *See Gallo,* 22 F.3d at 1225. Since the trial court is not to resolve issues of fact in deciding a motion for summary judgment, the determination of whether the circumstances give rise to an inference of retaliatory discharge "must be a determination of whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a [retaliatory] motive. It is *not* the province of the summary judgment court itself to decide what inferences should be drawn." *Chambers,* 43 F.3d at 38 (emphasis supplied); *accord Cronin,* 46 F.3d at 204.

The district court found that LaFond had not established a prima facie case because he "failed to even minimally establish that his act of reporting alleged violations of law to a public body was the cause of his termination." *LaFond,* No. 2:92CV571, slip op. at 14. Rather, the court found that "the evidence compel[led] the conclusion that [General Physics] fired [LaFond] for his behavior, both in attempting to improperly extort [General Physics] and in thwarting [General Physics'] legitimate attempts to determine the truth of [LaFond's] complaints." *Id.* at 13. The court noted that at the conclusion of his investigation, "it was clear to Thames that [LaFond] was a disaffected employee who wanted a more senior employee to be fired," *id.,* and that to accomplish this end, LaFond "had chosen to blackmail Thames by threatening to disclose information of purported violations of law ... to both government agencies and valued clients," *id.* The court also cited Thames' testimony in which he stated that the reason why he terminated LaFond was because LaFond had sent him an extortionate letter that was unsubstantiated. It further found that LaFond led Thames to believe that he was intentionally

174

withholding evidence of Urso's purported wrongdoing, thereby continuing to exhibit reckless behavior and poor judgement. Additionally, the court found that "neither [LaFond] nor any other employee interviewed by Thames provided proof of [LaFond's] allegations against Urso." *Id.*

 Upon carefully reviewing the record herein, we conclude, contrary to the district court, that LaFond presented sufficient evidence to support an inference that he was discharged in retaliation for reporting suspected violations of federal law to the NUSC and CDOL. The district court was not free to credit as true as a matter of law Thames' testimony that LaFond was discharged because he sent what Thames deemed an extortionate and unsubstantiated letter. *See Chambers*, 43 F.3d at 38 ("The [trial] court was not free to accept ... [an] affidavit as true as a matter of law."). The evidence was such that a reasonable inference to the contrary could have been drawn. Bunty specifically mentioned LaFond's reporting of his claims to a public body in the discharge letter, stating: "The fact that you threatened to mail these unsupported charges to the [NUSC] and other parties in an attempt to coerce [General Physics] into discharging [Urso], and *did in fact eventually mail these unsubstantiated allegations to at least the [NUSC]*, causes to [sic] question your judgement and reliability." (emphasis supplied). Thames testified at a deposition that LaFond would not have been discharged at all had he come to him directly with his claims, stating:

Had [LaFond] done this in the manner that we encourage in this company, had [LaFond] come to me directly and said [Thames], I got real concerns against this fellow named [Urso] and I got these allegations I'm going to make about him between you and I, would you please investigate them, had he done it in that manner, [LaFond] would probably be employed here today.

A finder of fact could certainly draw an inference from this evidence that LaFond's reporting of the suspected violations to public bodies was the actual cause of his discharge. To be sure, it is not within the province of the trial court at the summary judgment

stage to resolve ambiguities and draw inferences in favor of the movant. *See Gallo*, 22 F.3d at 1223; *Donahue*, 834 F.2d at 57.

We conclude that LaFond satisfied his *de minimis* burden of presenting evidence from which a rational inference of retaliatory discharge under § 31–51m(b) could be drawn. Hence, LaFond presented adequate evidence so that summary judgment could not be granted on the basis of failure to make out a prima facie case.

### 2. *General Physics' Defense*

 Under *McDonnell Douglas*, once a plaintiff demonstrates a prima facie case, the defendant is obligated to produce evidence " 'which, *taken as true*, would *permit* the conclusion that there was a [non-retaliatory] reason for the adverse action.' " *Gallo*, 22 F.3d at 1226 (quoting *Hicks*, —— U.S. at ——, 113 S.Ct. at 2748 (emphasis in original)). The district court found that General Physics established through Thames' testimony and the letter of termination that it discharged LaFond "because he exhibited recklessness and poor judgment [sic] during the course of events set in motion by [LaFond's] 'anonymous' letter." *LaFond*, No. 2:92CV571, slip op. at 14. We find the evidence sufficient to support a conclusion that General Physics met its burden of articulating a legitimate, non-retaliatory reason for LaFond's discharge. *See Gallo*, 22 F.3d at 1226.

### 3. *Pretext for Retaliatory Discharge*

 Since General Physics articulated a legitimate, non-retaliatory reason for LaFond's discharge, LaFond's burden at trial under *McDonnell Douglas* would be to prove by a preponderance of the evidence that the reason articulated was a pretext for retaliatory discharge. *See, e.g., Chambers*, 43 F.3d at 38. "Pretext may be demonstrated either by the presentation of additional evidence showing that 'the employer's proffered explanation is unworthy of credence,' or by reliance on the evidence comprising the prima facie case, without more...." *Id.* (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095); *see also Gallo*, 22 F.3d at 1226. Thus, unless the employer has come forward with evidence of

a dispositive non-retaliatory reason "as to which there is no genuine issue and which no rational trier of fact could reject, the conflict between the plaintiff's evidence establishing a prima facie case and the employer's evidence of a [non-retaliatory] reason reflects a question of fact to be resolved by the factfinder after trial." *Cronin*, 46 F.3d at 203.

The district court found that the evidence did not support LaFond's argument that General Physics' stated reason for his discharge was a pretext concealing a retaliatory motive. The court noted that it was "[v]ery likely, [LaFond's] threat to disclose his information to valued clients, without more, would have prompted the same reaction by [General Physics], both in conducting an investigation and in terminating [LaFond]." *LaFond*, No. 2:92CV571, slip op. at 15. It also noted that LaFond's addition of public bodies to the list of those he would inform, "while triggering the Act's protection, in all likelihood did nothing to alter Thames' response to the threat that was ultimately made by [LaFond]." *Id.* The court credited testimony by Thames in which he stated that he would have conducted the same investigation upon being made aware of the allegations even if LaFond had not threatened to take the complaint to the government. The court concluded that LaFond "provided no evidence supporting the conclusion that the true reason for his termination was his act of mailing his letter to public bodies. Rather[,] the evidence support[ed] the conclusion that had [LaFond] not taken that one step the remaining facts would be unchanged." *Id.*

■■■ As stated earlier, the role of the trial court at the summary judgment stage is limited to discerning whether there are any genuine issues of material fact to be tried, *not* to deciding them. *Gallo*, 22 F.3d at 1224; *Donahue*, 834 F.2d at 58. In determining whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *Gallo*, 22 F.3d at 1223; *Donahue*, 834 F.2d at 57. Herein, the district court resolved disputed issues of fact and drew inferences in favor of the movant, rather than limiting its analysis to determin-

ing whether there were any genuine issues of material fact to be tried.

■■■ It is undisputed on the present record that LaFond personally *believed* his charges against Urso to be true. Although General Physics' investigation resulted in what it perceived as no direct evidence in support of LaFond's claims, General Physics' own witnesses have stated their belief that LaFond personally believed the charges. Indeed, the record supports, at least inferentially, that some of the allegations actually *may* have been true, at least to some degree. With regard to the claim involving the security violation, Galloway, Chown and Stone indicated that they had recollections regarding a secret document and a fax relating to it, albeit there was some question as to whether Urso was the person involved. Edmond indicated that LaFond had related to her his allegations regarding Urso's "sneaking into people's desks," for whatever materiality that may have regarding that claim. Thames even admitted that he found "kernels of truth" woven throughout LaFond's claims. Furthermore, General Physics initiated the investigation upon an assumption that copies of the letter had already been mailed. Thus, any continuing fear of threat of extortion was no longer present.

If all permissible inferences are drawn in favor of LaFond, a rational jury could conclude, based on these facts, that LaFond actually suspected that there had been violations of federal law; that General Physics conducted its investigation in anticipation that a government inquiry would result based upon LaFond's report of his claims; and that General Physics discharged LaFond because he reported the violations to public bodies, not because he mailed an extortionate letter containing unsubstantiated claims. It may be that after a trial, a jury will find that General Physics did not discharge LaFond in retaliation for his reporting of the suspected violations to the NUSC and CDOL. "The question of which inference to draw, however, is a matter exclusively within the province of the jury." *Ramseur*, 865 F.2d at 467.

We conclude that LaFond presented sufficient evidence to raise a genuine issue of material fact regarding whether General

Physics' stated reason for discharging him was a pretext concealing a retaliatory motive. Accordingly, we hold that summary judgment in favor of General Physics was improper.

### B. *Good Faith Requirement*

We briefly address LaFond's argument on appeal that the district court erred by imposing a requirement of good faith under § 31–51m(b). As an alternative ground for granting summary judgment in favor of General Physics, the district court held that § 31–51m(b) imposes a requirement of good faith, which it concluded LaFond lacked because it found that LaFond's "sole and admitted purpose in notifying public bodies of suspected violations of law was to obtain the Act's protection when it became clear that his extortionate scheme had failed and his job would be in jeopardy if he were found out." *LaFond,* No. 2:92CV571, slip op. at 17.

We agree with the district court that a measure of "good faith" is required under § 31–51m(b). Section 31–51m(b) states on its face that its provisions are not applicable "when the employee knows that such report is false." Conn.Gen.Stat. § 31–51m(b). Furthermore, caselaw elsewhere has imposed a requirement of good faith when construing whistleblower statutes generally. *See, e.g., Wolcott,* 691 F.Supp. at 1063, 1065 (where an employee filed an action under Michigan's whistleblower statute alleging that he was fired in retaliation for lodging complaints against his employer with state agencies, and had written a letter to his employer and threatened to mail it to authorities if his demands were not met, the court found that the employee was not entitled to whistleblower protection because his intention was to report the alleged violations only if his demands were not met and there was no indication that good faith played a role in his decision to go to the authorities); *Melchi,* 597 F.Supp. at 583 (where Michigan's whistleblower statute limited its protection by excluding reports that were known to be false, the court found that "[b]y precluding protection to those acting in bad faith, the legislature clearly implied that only those acting in good faith are entitled to protec-

tion."). Nonetheless, we conclude that summary judgment was improper on the facts of this case because we find that genuine questions of material fact exist regarding whether LaFond lacked "good faith" when seeking the protections of § 31–51m(b).

### CONCLUSION

For the foregoing reasons, the judgment of the district court is vacated, and the matter is remanded for further proceedings.

### Appendix "A"

March 6, 1992

Dear Mr. Thames:

We are a group of concerned employees who wish to bring to your attention the illegal, immoral, and unethical activities of Mr. R.F. URSO. We do this in order to give you an opportunity to take the action necessary to prevent Mr. Urso from continuing this conduct. We do not want to bring this matter to the attention of government authorities as we are very concerned that any kind of government investigation would be a very serious situation for our company: The companies [sic] reputation could be ruined; the government could find cause to shut us down; we could all lose our jobs; and innocent people may be harmed. Please be advised that everything we disclose here is documented and will be verified by more than one person in the event of an investigation.

Mr. Urso is not a man who conducts himself in an HONEST and ETHICAL manner. Quite the contrary. Mr. Urso is a thief, a lier [sic], a cheat, and a man who commits crimes. He is discriminatory in his hiring and promotion practices. He knowingly and repeatedly violates Federal Labor Laws, Federal Civil Rights Laws, and company policy. He condones sexual harassment and the abuse of the female employees in his organization, and protects managers who commit this crime. He has stolen government documents from the desks of NUSC Code 34 employees, (this crime committed while in the uniform of a U.S[.] Naval Intelligence Officer on Reserve duty). He attempted to coerce an employee to destroy and hide the fact from the NIS that a SECRET govern-

ment document had been found in one of our facilities. He could be investigated for a conflict of interest in the Periscope contract win for (1) stealing documents related to the contract, and (2) paying for Mr. Andy Depta (NUSC NLL CODE 34), and his family's meals, transportation, and lodging on ski trips to the company condo. He directs his employees to work proposals on government time, and directs them to charge the time to the government, i.e. EB, and NUSC.

Please review the attached material. For many reasons we have remained silent about these things. Fear of reprisal, fear of losing our jobs, fear of not being believed. But we are bothered by our conscience so severely that we refuse to withhold this information any longer.

We feel this information should be brought to the attention of government authorities, but we are concerned that it could bring harm to innocent people. Mr. Urso alone is responsible for these acts, and we are very concerned that if he continues this kind of misconduct, we will lose our jobs because the company will be shut down. Therefore we want to give you an opportunity to take corrective action "in-house," and will reconsider any action we may take based upon your handling of this matter.

We are hopeful that within 24 hours of your receipt of this letter swift, definitive, and highly visible, corrective action is taken to prevent Mr. Urso from continuing to jeopardize our livelihoods, and the good name of this company. *If he is removed from his position, or a similar action is taken against him,* we will consider the matter closed, and in the interest of not causing harm to innocent people or to the good name of our company, will drop the matter entirely. If no action is taken we feel very strongly that the most correct and honest action for us to follow is to forward this letter and the attached material to Mr. J. Feldman of National Patent, The Commanding Officer of NUSC Newport, R.I. and New London Ct. Labs, Defense Investigative Agency, Groton[,] Ct., the US Naval Reserves; the Chief of Naval Operations, Mr. Tony Crumby, and Ms. Jill Collins, the Police Depts[.] of Groton, Led-

yard, Newport, RI. [sic]; the Ct. and RI State police, the CT. and RI Attorney's [sic] General; the CT. and RI Labor Dept.

We do not want to harm this company or jeopardize it's [sic] future success. We are afraid enough about what is happening in our economy (Seawolf etc[.]). We also do not need the close scrutiny that an investigation would bring upon us. This would be a terrible time for anyone to discover what Mr. Urso has done, or may be continuing to do. Please don't let this man jeopardize our livelihood and the welfare of our families any longer. I trust you will take this matter very seriously and act in the interest of your employees, your company, and in a manner that protects us from reprisal by Mr. Urso, or anyone else.

Thank you, Concerned employees

Between May 1987 and the present, the following events occurred:

The following people were either aware of or part of some or all of these events:

| | |
|---|---|
| R.STONE | J.CHOWN |
| K.BAER | T.ALLEN |
| R.LAMBERT | J.ODAY |
| P.LaFOND | D.MILES |
| C.GALLOWAY | L.BROWN |
| B.VESCOVI | D.RAUNIG |
| F.BENNET | B.WADE |
| C.URSO | G.SCOVONI |
| T.CRUMBY | J.COLLINS |
| B.ROSE | D.PHOENIX |

THEFT OF GOVERNMENT DOCUMENTS

Mr. Urso stole government papers from the desks and file cabinets of NUSC Code 34 employees. The kinds of documents he stole were contract related—costing information—and anything he could steal that would provide him with insight into the Periscope contract proposal. Some of the information may have been deliberately left out for him to steal. He stole these papers and documents while in the uniform of a naval officer during the time when his reserve unit was on active duty weekend at NUSC. Mr. Urso is a Naval Intelligence Officer in the United States Naval Reserve. He has shown some [sic] the papers and documents he stole and

178

where he kept them to some of the individuals listed above.

## THEFT OF PERSONAL CORRESPONDENCE

Mr. Urso has in his possession a copy of a letter he stole from the files of Mr. Tony Crumby, an employee of Mr. Urso's. The letter, penned by Ms. Jill M. Collins relates to her feelings about an extremely personal relationship between Mr. Crumby and Ms. Collins. The letter is very incriminating and could be destructive to Mr. Crumby's personal life. Ms. Urso has shown this letter to some employees, and has bragged about the fact that her husband has it, and keeps it in his desk. Neither Mr. Crumby nor Ms. Collins know of this at the present time.

Mr. Urso is suspected by many of us of snooping in the desks of his employees. We suspect that violates the privacy of our desks and the other personal items often.

## SECURITY VIOLATION

Mr. Urso attempted to coerce an employee to illegally destroy a secret document that was found in the New London facility. He directed the employee to get rid of the document—and [sic] to not give it to the NIS because he didn't want to be investigated. The employee placed the document in the hands of the NIS in Groton in spite of Mr. Urso's urging not to.

## VIOLATION OF EEO, AND COMPANY POLICY (1990/91)

Mr[.] Urso promoted a number of people in his organization to positions of management without posting the job in house so other employees would have an opportunity to apply for the position. Mr. M. Hagerman was hired as a Project manager; Mr. G[.] Miller was promoted from Project Manager to Sr. Project Manager manager; Mr. L. Robbins was promoted to fill Mr[.] G. Miller's vacated Position; and Mr. D. Ellington was hired as a Project Manager, and then promoted to a Sr. Project Manager. Mr. Urso Promoted [sic] his wife to a technical management position she was not qualified to fill, and gave her a pay raise to more than $31,000 p/yr. Shortly after her promotion and pay raise, Ms. Urso went out on comp[.]—the period of

time she was out on comp. coincided with the summer vacation of her children. None of the positions mentioned above were announced or posted so that other employees could apply.

## SEXUAL HARASSMENT

Mr. Urso was aware of and protected a manager (D. Ellington) who had been sexually involved with a female employee, Ms. Seebeck, who was in his work group. Mr. Ellington was married at the time, contracted an STD from a third partner, infected Ms. Seebeck and his wife with the STD. [sic] He told his wife that Ms. Seebeck infected him—Mrs. Ellington began to harass Ms. Seebeck—Ms. Seebeck complained to Mr. Ellington—Mr. Ellington began to harass Ms. Seebeck, she complained to Mr. L. Burgess who covered for Mr. Ellington. All this was known by Mr. Urso. Only after Ms. Seebeck went to an attorney did Mr. Urso let Mr. Ellington go. He was not fired, but allowed to resign. The STD Ms. Seebeck was infected with caused serious infection, hospitalization, and loss of her ability to have children.

## CONFLICT OF INTEREST

During the period of time prior to our win of the [P]eriscope contract, Mr. Urso entertained Mr. Andy Depta and his family on several occasions at the company condo.. [sic] He drove them to the condo in the company van and paid for their meals and ski lift tickets. Mr. Andy Depta is the COTR of the Periscope contract.

## ILLEGAL CONTRACT CHARGES

Mr[.] Urso directs his employees to work contract proposals during normal working hours and to charge the time off to the government. He has at least one employee on his staff who works full time on proposals, charging some or all of his time off to the government.