David ROGATH, Plaintiff,

v.

Werner E.R. SIEBENMANN, Defendant.

No. 93 Civ. 7566 (DAB).

United States District Court,
S.D. New York.

Sept. 30, 1996.

Kurzman & Eisenberg, LLP, White Plains, NY (Guy R. Fairstein, of counsel), for Plaintiff.

John B. Koegel, New York City (John B. Koegel, of counsel), for Defendant.

### MEMORANDUM and ORDER

BATTS, District Judge.

Plaintiff, David Rogath, brings this action against Defendant, Werner Siebenmann, for breach of contract, breach of warranty and fraud resulting from Plaintiff's purchase of a painting from the Defendant. Plaintiff now moves for leave to amend his Complaint and for partial summary judgment on the breach of warranty claims. Plaintiff also moves to compel a deposit of money with the Court pursuant to Rule 67 of the Federal Rules of Civil Procedure.

### I. BACKGROUND

#### A. Defendant's Initial Involvement with the Painting

This case revolves around a painting, by a well-known English artist, Francis Bacon, entitled *Self Portrait* ("the Painting"). (Pl.

1. In July or August of 1993, Defendant requested that his $50,000.00 fee be increased to $70,-000.00 and Jenkins agreed. (Def.Dep. at 81.)

& Def. 3(g) Statements ¶¶ 9.) It was allegedly painted in 1972, in oil, on a 78″ by 58″ canvas. (*Id.*) It was signed by Bacon on the back upper left quadrant. (*Id.*; Alley Aff. Ex. 1.)

Approximately in August 1992, Bruce Jenkins ("Jenkins"), a long time acquaintance of the Defendant, asked Defendant to sell the Painting. (Def.Dep. at 18–19.) Defendant agreed to act as an agent in return for a flat fee of $50,000.00, as compensation for his services in selling the Painting.[1] (Def.Dep. at 21.) Jenkins told Defendant that a wealthy Australian acquired the Painting through Robert Buhler. ("Buhler") who "was apparently a friend of Bacon when the sale took place." (Def.Dep. at 22–23, 28.) Jenkins refused to reveal the name of the Australian who owned the Painting. (Def.Dep. at 23.) Defendant asked Buhler's widow, Lilla Duckworth, if she remembered the transaction in which Buhler supposedly acquired the Painting from Bacon. She did not recall such a transaction. (Def.Dep. at 34–36.)

Defendant believed that Jenkins was acting on behalf of a client of Allan Sawyer ("Sawyer"). (Def.Dep. at 28.) Defendant first met Sawyer prior to 1992, and then again, through Jenkins, in 1992. (Def.Dep. at 10–11.) Sawyer told Defendant that he was acting on behalf of Brodie Collection Services ("Brodie").[2] Sawyer also told Defendant that Brodie was acting on behalf of a wealthy Australian, whose name he would not reveal. (Def.Dep. at 28–29.) Jenkins told Sawyer in a previous conversation that the Painting was owned by a wealthy Australian who would remain anonymous. (Sawyer Aff. ¶ 13.) Jenkins nor Sawyer ever relayed information different from this to Defendant. (Def.Dep. at 29–30.) Sawyer never alleged that he owned the Painting. (Fairstein Aff. Ex. 4.)

#### B. Purported Transfer of Ownership of the Painting to the Defendant

Prior to the Painting being sold, Sawyer informed Defendant that Sawyer had been

2. Brodie specialized in liquidating estates and assets for people who were having financial difficulties. (Def.Dep. at 29.)

asked to transfer the Painting into the Defendant's name. Defendant did not know whose idea it was to transfer the Painting into his name. Jenkins told Defendant that the transfer of the Painting to him was to avoid the "seller's creditors." The seller had a bankrupt business and was concerned that the company's creditors may "turn at a later stage to seize his private assets." (Def.Dep. at 37.)

Sawyer sent a letter to Defendant dated January 26, 1993, on Brodie Collections letterhead, signed by Paul Medley, confirming "that as of [January 27, 1993] ownership of the Francis Bacon self portrait is transferred to: Mr. Wer [sic] Siebenmann." (Def.Aff. Ex. A.) Sawyer prepared this letter in response to Jenkins's statement that some evidence was needed "showing that the Painting had been transferred to Siebenmann." (Sawyer Aff. ¶ 20.) Sawyer knows the owner of Brodie and is permitted to use the office to make phone calls, send faxes, and perform other activities. (Sawyer Aff. ¶ 21.) Paul Medley, who signed the letter with the title "Legal Department" is "just a man working for commission at the Debt Collection Agency." (Sawyer Aff. ¶ 21.) Sawyer did not consult with the owner of Brodie in preparing the letter but told Medley that there would be a fee in it for him if the Painting was sold. (Sawyer Aff. ¶ 22.) Defendant contends, that as a result of this arrangement, he was acting as "nominee" for the Painting. Defendant defines nominee as "an owner of an object for a certain amount of time until it is disposed of." (Def.Dep. at 30–31.) Defendant did not transfer money or anything of value to anyone in order to become owner of the Painting. (Def.Dep. at 81.)

## C. Defendant's Possession of the Painting

On December 10, 1992, Defendant moved the Painting from London, England, to Geneva, Switzerland and in the care of Mat Securitas. (Def.Dep. at 38, 61.) After seeking Jenkins' permission, Defendant removed the Painting from Mat Securitas on June 4, 1993, because it was too costly to store it there.

Defendant moved the Painting to the Baily Shatkin office of which Defendant was part owner. (Def.Dep. at 7, 63.) The Painting was not insured in the Baily Shatkin office and Defendant did not bear the financial risk of the Painting being stolen or damaged. (Def.Dep. at 6–7, 63.)

## D. Marlborough Questions Painting; Barran Aborts Sale

Defendant gave Tim Pringle ("Pringle"), an art dealer, written permission for access to the Painting at Mat Securitas in order to show it to prospective buyers. Pringle visited the Painting on at least two occasions. The first time, Defendant and Julian Barran, a London art dealer, accompanied Pringle. (Def.Dep. at 54; Pl. and Def. 3(g) Statement ¶¶ 13.) The second time, Julian Barran and two people from the Marlborough Fine Art Gallery (London) Ltd. ("Marlborough"), one of whom was Valerie Beston,[3] accompanied Pringle. (Def.Dep. at 112–13.) After this visit, Pringle told Defendant that the Marlborough representatives who visited the Painting "weren't sure about the black; they weren't sure about the withered leg." Pringle also told Defendant that Julian Barran told Pringle that Bacon did not paint with pink. (Def.Dep. at 129.)

Julian Barran, who had visited the Painting twice, who considered purchase of and who was aware of Marlborough's opinion of the Painting, decided not to purchase the Painting. (Pl. & Def. 3(g) Statement at ¶¶ 17.) Barran had "resigned himself to the fact that, if the Marlborough Gallery objects it's really difficult because they were Bacon's agent." (Def.Dep. at 186.) Defendant testified that the Marlborough opinion was enough to deter Barran from purchasing the Painting. (Def.Dep. at 186.)

## E. Miller Aborts Sale

In April 1993, Defendant contacted Robert Peter Miller ("Miller") who owned an art gallery in New York. (Pl. & Def. 3(g) Statements at ¶¶ 18–19.) The sale of the Painting to one of Miller's clients "fell through be-

---

**3.** Valerie Beston had been Bacon's secretary for a number of years and was the managing director of Marlborough. (Pl. & Def. 3(g) Statements ¶¶ 31.)

cause Robert Miller's client called Marlborough and Miller spoke to David Sylvester." (Pl. 3(g) Statements Ex. F; Def.Dep. at 143.) David Sylvester ("Sylvester") was a British art critic and a follower of Bacon. (Pl. & Def. 3(g) Statements ¶¶ 21.) Sylvester advised Miller not to proceed with the purchase of the Painting because of the "Marlborough objection and that he wasn't sure himself of the authenticity of the Painting." (Pl. & Def. 3(g) Statements ¶¶ 22; Def.Dep. at 144.)

### F. Sotheby's Aborts Sale

Defendant contacted Sotheby's in Geneva regarding the sale of the Painting. Tobias Myer ("Myer"), a representative of Sotheby's London, viewed the Painting in Geneva. Subsequently, Myer sent a letter dated April 8, 1993, to Defendant proposing that Sotheby's handle the sale of the Painting. (Pl. & Def. 3(g) Statements at ¶¶ 24; Pl. 3(g) Statement Ex. G.) After Myer wrote the letter, he asked Defendant if anyone else had seen the Painting. Defendant told Myer about the Marlborough visit and that the Marlborough representatives had made remarks about the Painting. (Pl. & Def. 3(g) Statements ¶¶ 25.) As a result of this conversation, Myer called Marlborough. Consequently, Sotheby's decided not to continue with the sale of the Painting. (Pl. & Def. 3(g) Statements ¶¶ 27.) Myer told Defendant that "if the Marlborough Gallery were going to be objectionable about the Painting, that they, Sotheby's, couldn't handle it." (Def.Dep. at 115; Pl. & Def. 3(g) Statements ¶¶ 28.)

On April 23, 1993, subsequent to Sotheby's withdrawal of its offer to sell the Painting, Defendant called Marlborough and spoke to John Erle–Drax ("Drax"). (Pl. & Def. 3(g) Statements ¶¶ 29.) According to Defendant's notes, Drax had several problems with the Painting: First, that Valerie Beston never saw the Painting prior to her visit to Mat Securitas. Second, that the Painting used shiny black paint while the Francis Bacon paintings at the Tate used matte black. Third, that the Painting has "every element of Francis picture put into one." Finally, that Beston did not believe that Buhler acquired the Painting directly from Bacon. (Pl. 3(g) Statement Ex. H; Pl. & Def. 3(g)

Statements ¶¶ 33.) Drax believed that Beston was "the sole authority in the world on Francis Bacon." (Def.Dep. at 388.) Defendant testified that Drax addressed these points, as items Marlborough questioned in terms of authenticity. (Def.Dep. 119.) He later testified that Drax was unclear whether he thought the Painting was a Bacon Painting. (Def.Dep. at 120.)

### G. The Sale of the Painting to Plaintiff

In June 1993, Defendant received a fax from Anita Goldstein, an art dealer in Zurich, Switzerland, through whom Defendant was attempting to sell the Painting, (Def.Dep. at 186–87), which stated:

> I have a client ready to buy your painting at the price of 500,000—U.S. $.... This is a very good and realistic price due to the controversial situation of your painting. I frankly thing [sic] we can not [sic] do better since everybody is afraid of the authenticity.
>
> The client's requirement is: a machine typed authentic paper from Alle[y].

(Pl. 3(g) Statement Ex. I.)

Ronald Alley was a curator at the Tate Gallery and author of a detailed survey of Bacon's work as well as several other writings about Bacon. He viewed the Painting in April 1993, and was convinced of its authenticity. (Alley Aff. ¶¶ 2, 7.) He wrote his opinion as to the authenticity of the Painting on the back of a color photograph of the Painting. Weeks later, he received a letter from David Sylvester stating that the Painting was a "nasty fake." (Alley Aff. ¶ 8.) Defendant believes that Alley showed Defendant this letter, and, at a minimum, conveyed the contents of the letter to him. (Def.Dep. 381–82.)

In July 1993, Defendant sold the Painting to Plaintiff Rogath for $570,000.00, with the following warranties contained in the Bill of Sale:

> In order to induce David Rogath to make the purchase, Seller and Anita Goldstein, Agent for Seller, do make the following warranties, representations and covenants to and with the Buyer.

1. That the Seller is the sole and absolute owner of the painting and has full right and authority to sell and transfer same; having acquired title as described in a copy of the Statement of Provenance signed by Seller annexed hereto and incorporated herein; that the Seller has no knowledge of any challenge to Seller's title and authenticity of the Painting; ... that the painting is an authentic original oil painting by the renowned artist, Francis Bacon.

(Pl. 3(g) Statement Ex. A.)

The Provenance read as follows:

I hereby declare that I am the sole owner of the painting by Francis Bacon as described in the attached certificate by Ronald Alley on the reverse side of the photo of the painting.

The painting was originally purchased in London in June 1975 by Mr. Alan Sawyer of 15 Rosemont Avenue, Woollahra, Sydney 2025, New South Wales, Australia, through Mr. Robert Buhler who acted on behalf of the artist directly.

Ownership of the painting passed to me on the date shown on the letter from Brodie Collection Services acting on behalf of Mr. Sawyer.

(Pl. 3(g) Statement Ex. B.) The Provenance was dated June 25, 1993, and signed by the Defendant. (Id.)

### H. Sale of Painting to Acquavella

In late October 1993, Plaintiff sold the Painting to Acquavella Contemporary Art, Inc. ("Acquavella") for $950,000.00. (Pl. & Def. 3(g) Statements ¶ 77.) On November 1, 1993, as a result of a written memorandum from Valerie Beston characterizing the Painting as an "outright fake," Acquavella requested that Plaintiff refund the $950,000.00 and accept the return of the Painting. (Pl. & Def. 3(g) Statements ¶ 78; Pl. 3(g) Statement Ex. T.) On November 2, 1993, Plaintiff returned $950,000.00 by check to Acquavella

and received the Painting back from Acquavella and placed it in his warehouse. (Pl. & Def. 3(g) Statements ¶¶ 79–80.) Plaintiff commenced this action on November 3, 1993.

## II. DISCUSSION

### A. Leave to Amend Complaint

Plaintiff seeks leave to amend his Complaint. Rule 15(a) of the Federal Rules of Civil Procedure states that leave to amend a pleading "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). The United States Supreme Court held in *Foman v. Davis* that:

> In the absence of any apparent or declared reason such as undue delay, bad faith or dilatory motive on the part of the movant ... undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment etc.—the leave should, as the rules require, "be freely given."

371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

The Second Circuit has held that a "motion to amend should be denied only for such reasons as 'undue delay, bad faith, futility of the amendment, and perhaps most importantly, the resulting prejudice to the opposing party.'" *Richardson Greenshields Securities, Inc. v. Lau*, 825 F.2d 647, 653 n. 6 (2d Cir.1987).

In addition to "clean up" changes,[4] Plaintiff substantively amended paragraphs 5, 6, 13, 16, 20, 22, 25. Plaintiff amended paragraph five by adding that Defendant, in addition to entering into an agreement to sell the Painting to Plaintiff, "warranted, represented and covenanted to [Plaintiff that the Painting] was an original oil painting by the artist Francis Bacon." (Fairstein Aff. Exs. 1, 3.)

The remaining changes, in essence, specify the ways in which the Defendant breached his agreement with Plaintiff. Therefore, to paragraph six of the Complaint Plaintiff add-

---

4. These changes include deleting the representation of numbers in word form while leaving the numeric representation of numbers, replacing the word Plaintiff with Rogath, the Plaintiff's name, adding the short form for Acquavella Contemporary Art, Inc. parenthetically, rewording the incorporation of allegation clauses under each claim of the Complaint without changing the substance of the incorporation statement, among other non-substantive changes. (Fairstein Aff. Exs. 1 & 3.)

ed that Defendant warranted that title was acquired as per the Statement of Provenance. (Fairstein Aff. Exs. 1, 3.) Plaintiff amended paragraphs 13, 16, 20, 22, and 25 to specify that the claims arise from breach of four representations made in paragraph one in the warranties section of the Bill of Sale. (Fairstein Aff. Ex. 3.) The representations include that Defendant was the sole and absolute owner of the Painting, that Defendant acquired title as claimed in the Statement of Provenance, that Defendant knew of no challenges to the authenticity of the Painting, and that the Painting was an authentic Francis Bacon. (Pl. 3(g) Statement Ex. A.) In the original complaint, these paragraphs simply alleged that the claims arose because the Defendant failed to convey title to a true and authentic Francis Bacon painting. (Fairstein Aff. Ex. 1.)

■ Defendant argues that Plaintiff's motion to amend his Complaint as to Paragraph 6[5] should be denied because the Court should not allow the addition of new claims not based on or derived from facts in discovery. The Court finds no merit to this argument. There is no evidence that Plaintiff knew prior to discovery that Defendant did not acquire the Painting as stated in the Provenance. The only addition to paragraph six is the fact that title was not conveyed as the Statement of Provenance provides.

Furthermore, for the purposes of the summary judgment motion, the only other paragraph amended that pertains to Count II, on which Plaintiff is moving for summary judgment, is paragraph 16. Paragraph 16 details the breaches of warranties that Defendant made. However, all the warranties were stated at other times in the original Complaint. (Compl. ¶¶ 6(a)–(c), 16)

Finally, the Defendant does not argue that the amendments will cause undue delay or prejudice to him. Defendant does not argue that he has not had complete discovery with regard to the amendments. Nor does Defendant argue that the amendment is futile or made in bad faith. The Court finds the changes simply detail claims already alleged

in the Complaint and are in line with discovery.

As the amendment does not cause undue delay or prejudice to Defendant and the amendment is not futile or made in bad faith, the Court grants Plaintiff leave to amend the Complaint as presented to the Court. *Richardson*, 825 F.2d at 653 n. 6. The amendments do not change the substance of this action, and have been fully discovered. Furthermore, Defendant has fully addressed Plaintiff's claims in his Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment. (*See, e.g.,* Def.'s Mem.Law at 9.) Motions for summary judgment are based on the evidence adduced during discovery, not merely on the pleadings. Accordingly, the Court finds that there is no reason to delay the action to allow the Defendant to answer the Amended Complaint. The Plaintiff is ordered to file the Amended Complaint within five days of receipt of this Memorandum & Order, in the form submitted to the Court as Exhibit 3 to his Notice of Motion.

**B. Partial Summary Judgment on Breach of Warranty Claim**

**1. *Summary Judgment Standards***

Plaintiff seeks partial summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure on Count Two of the Complaint which alleges breach of warranty. Plaintiff contends that Defendant breached the following warranties: First, that Defendant was unaware of any challenges to the Painting's authenticity. Second, that the Defendant was the sole and absolute owner of the Painting. Finally, that Defendant acquired title as described in the Provenance.

The principles applicable to summary judgment are familiar and well-settled. Summary judgment may be granted only when there is no genuine issue of material fact remaining for trial, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Corselli v. Coughlin,* 842 F.2d 23 (2d Cir. 1988). "[T]he plain language of Rule 56(c)

---

**5.** Defendant does not address the changes to paragraphs 5, 13, 16, 19, 20, 22, and 25.

mandates the entry of summary judgment, ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2549, 91 L.Ed.2d 265 (1986).

As a general rule, all ambiguities and all inferences drawn from the underlying facts must be resolved in favor of the party contesting the motion, and all uncertainty as to the existence of a genuine issue for trial must be resolved against the moving party. *La-Fond v. General Physics Servs. Corp.,* 50 F.3d 165, 171 (2d Cir.1995). As is often stated, "[v]iewing the evidence produced in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. LILCO,* 933 F.2d 187, 191 (2d Cir.1991); *see also Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 116 (2d Cir.1991).

### 2. *Breach of Warranty Claims*

Plaintiff claims that the Defendant breached several warranties found in the Bill of Sale and the Provenance. The Bill of Sale states in pertinent part:

> In order to induce David Rogath to make the purchase, Seller ... make[s] the following warranties, representations and covenants to and with the Buyer.
>
> 1. That the Seller is the sole and absolute owner of the painting and has full right and authority to sell and transfer same; having acquired title as described in a copy of the Statement of Provenance signed by Seller annexed hereto and incorporated herein; [and] that the Seller has no knowledge of any challenge

to Seller's title and authenticity of the Painting; ...

■■■ An express warranty is an affirmation of the quality or condition of the thing sold, which induces the buyer to buy the seller's product, the seller intending the inducement to have that effect. *Shippen v. Bowen,* 122 U.S. 575, 581, 7 S.Ct. 1283, 1285, 30 L.Ed. 1172 (1887); *Keenan v. D.H. Blair & Co.,* 838 F.Supp. 82, 90 (S.D.N.Y.1993); 8 Williston on Contracts § 954, at 357. An express warranty is similarly defined in the UCC as any "affirmation of fact or promise made by the seller to the buyer[,] which relates to the goods and becomes part of the basis of the bargain[,] creates an express warranty that the goods shall conform to the affirmation or promise." U.C.C. § 2-313(1)(a). Defendant made several warranties to the Plaintiff which appear in the Bill of Sale. It is clear from the language of the Bill of Sale that the warranties were meant to "induce" the Buyer to buy. Furthermore, the Defendant does not dispute that they are indeed warranties.[6] Accordingly, finding that the statements were indeed warranties, the Plaintiff must show that Defendant breached the warranties. *CBS Inc. v. Ziff-Davis Publishing Co.,* 75 N.Y.2d 496, 503, 554 N.Y.S.2d 449, 453, 553 N.E.2d 997, 1001 (1990).

#### a. Defendant's Knowledge of Challenges to Painting's Authenticity

Plaintiff contends that Defendant was aware of challenges to the Painting's authenticity. Defendant denies any such knowledge prior to the commencement of this action.[7]

Defendant admits that Pringle told him of the Marlborough representative's concerns about the shiny black paint, the withered leg and the fact that Bacon did not use pink paint. (Def.Dep. at 129.) Defendant admits

---

**6.** What Defendant does argue in his Memorandum of Law is that the language of the Bill of Sale of sale was drafted by an attorney and the language was never reviewed by him. Def.'s Mem. law at 8. These arguments are without merit because if the Defendant signed the Bill of Sale, he is presumed to have understood it, and he is therefore bound by its contents. *See Da Silva v. Musso,* 53 N.Y.2d 543, 444 N.Y.S.2d 50, 428 N.E.2d 382 (1981); *Dunkin' Donuts of Am.,*

*Inc. v. Liberatore,* 138 A.D.2d 559, 526 N.Y.S.2d 141 (1988).

**7.** Defendant denies any knowledge of challenges to the Painting and furthermore that full disclosure of any "problem[s]" occurred prior to the sale. ·Def.'s Mem.Law at 9. The citations to the Defendant's deposition do not support his position. It appears the Defendant's only argument is one of the meaning of "challenge." *See infra.*

that the Marlborough opinion was enough to deter Julian Barran from purchasing the Painting. (Def.Dep. at .186.) The Defendant's attempted sale to Robert Peter Miller fell through as a result of the comments made by Marlborough, and also the doubts of the British art critic David Sylvester as to the Painting's authenticity. (Pl. 3(g) Statement Ex. F; Def.Dep. at 143.) Defendant does not deny that he was aware of Sylvester's doubts about the Painting's authenticity. (Def.'s Aff. ¶ 41.)

Defendant also admits that Sotheby's refused to handle the sale of the Painting as a result of Tobias Myer's conversation with Marlborough. (Def.Dep. at 114; Pl. & Def. 3(g) Statements ¶¶ 28.) Defendant also spoke directly with a Marlborough representative who conveyed Valerie Beston's concerns regarding the Painting. These concerns included the fact that Beston had not seen the Painting prior to her visit to Mas Securitas, that the Painting appeared to encompass every element of a Bacon painting into one, and that other Bacon paintings used black matte paint not the shiny black paint used in this Painting. (Pl. 3(g) Statement Ex. H; Pl. & Def. 3(g) Statements ¶¶ 33.) Defendant testified that Drax brought up these points as factors Marlborough questioned in terms of authenticity. (Def.Dep. at 119.)

Defendant does not deny that he received the fax from Anita Goldstein which stated that "everybody is afraid of the authenticity" of the Painting. (Def.Dep. .at 186–87; Pl. 3(g) Statement Ex. I.)

■ The undisputed evidence before the Court leaves no doubt that Defendant was aware of challenges to the authenticity of the Painting. Defendant's argument in opposition to this finding seems to be that no one explicitly used the words that the "authenticity" of the Painting was being "challenged." The Court finds this argument unpersuasive.[8] "Challenge" means to put a fact into dispute or render it doubtful. *Black's Law Dictionary*, 209 (5th Edition). The comments or questions made by Marlborough and Sylves-

ter put in dispute the authenticity of the Painting, in that they questioned aspects of the Painting that made it less likely that it was actually painted by Francis Bacon. Accordingly, the Court finds Defendant breached the warranty contained in the Bill of Sale warranting that Defendant had no knowledge of any challenges to the authenticity of the Painting.

**b. Defendant as Sole and Absolute Owner of the Painting**

Plaintiff alleges that Defendant was not the sole and absolute owner of the Painting, thus breaching the warranty in the Bill of Sale. Defendant contends that he was nominee for the Painting and thus he was the sole and absolute owner of the Painting at the time it was sold to Plaintiff and had the ability to convey title.

A nominee is "[o]ne designated to act for another as his representative in a rather limited sense. It is sometimes used to signify an agent or trustee. It has no connotation; however, other than that of acting for another, in representation of another, or as grantee of another." *Black's Law Dictionary*, 947 (5th Edition).

■ Defendant did not transfer anything of value to anyone to become the "owner" of the Painting. (Def.Dep. at 81.) In addition, Defendant acknowledges that he did not bear the risk of loss if the Painting was stolen or damaged while in the Baily Shatkin office, because he "felt like he was acting on behalf of other people." (Def.Dep. at 6–7, 63.) Further, Defendant was not entitled to the proceeds from the sale but only a flat fee for his involvement in the sale. (Def.Dep. at 21, 81.) In Defendant's deposition testimony, when asked if he distinguished between nominee ownership and original ownership, Defendant replied that "nominee ownership is something in the stock market where someone is acting on behalf of someone else to effect a sale." (Def.Dep. at 77.) The type of nominee ownership in the stock. market to which the Defendant was referring is "where

---

**8.** The Defendant makes no effort to substantiate his definition of "challenge" either in argument, case law, or trade or business practice.

a securities brokerage will maintain securities in its own name for the benefit of a customer." (Def.Dep. at 77–78.)

In addition, the letter purporting to convey ownership to Defendant was created by Sawyer and Medley, neither of whom were the owner of the Painting. (Sawyer Aff. at 20–21.) Further, the Defendant presented no evidence that the true owner consented to or authorized the conveyance. Sawyer, who allegedly was acting on behalf of the true owner, did not sign the letter on the owner's behalf.

Based on the Defendant's own testimony, the Court finds that the Defendant was acting on behalf of the owner and was not the sole and absolute owner of the Painting. The Court also finds that the letter purporting to transfer ownership to the Defendant was not sufficient to transfer sole ownership to Defendant. Thus, the warranty in the Bill of Sale representing that Defendant was the "sole and absolute owner of the Painting . . ." was breached.

### c. Defendant Acquired Title as Described in the Provenance

Plaintiff alleges that Defendant did not acquire title from Sawyer as stated in the Provenance. Defendant argues that "any investigation undertaken by him subsequent to June 25, 1993 contradict the method or means by which [Defendant] acquired title and that there is no evidence in the record that this method or means did not actually occur. . . ." (Def. 3(g) Statement ¶ 67.)

■ Having found that Defendant was not the owner of the Painting he could not have had title. Hence, the warranty is breached in that regard. The warranty is also breached because although Sawyer represented to Defendant that he was not the actual owner of the Painting and that his name should not appear on the Provenance [9], his name appeared on the Provenance as conveying title

to Defendant. (Def.Dep. at 174–176.) Thus, the second paragraph of the Provenance stating that the Painting "was originally purchased in London in June 1975 by Mr. Alan Sawyer. . . ." is false as per Sawyer himself as well. Thus the statement in the Bill of Sale warranting that the Defendant "acquired title as described in the Statement of Provenance" was breached.

### C. Damages

■ The Court finds that Plaintiff is entitled to damages for the breach of warranty claim as set forth in the Amended Complaint. Plaintiff seeks to recover $950,000.00 in damages from Defendant for the breach of warranty. This amount represents the price Plaintiff lost in the aborted sale to Acquavella. "Under New York law, breach of warranty damages are usually measured by the benefit of the bargain rule." *Bennett v. United States Trust Co.*, 770 F.2d 308, 316 (2d Cir.1985) (citing *Clearview Concrete Prods. Corp. v. St. Charles Gherardi, Inc.*, 88 A.D.2d 461, 453 N.Y.S.2d 750, 756 (1982)), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986). The damages claimed "must be measurable with a reasonable degree of certainty and must be adequately proven." *Clearview,* 453 N.Y.S.2d at 756. Further, consequential damages are recoverable for "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise. . . ." U.C.C. § 2–715. In the case at bar, Plaintiff provides copies of checks and receipts for the sale of the Painting to Acquavella for $950,000.00. (Pl. 3(g) Statement Ex. S & U.) Defendant does not dispute that the sale and subsequent rescission of the sale took place. As a result, the damages suffered by Plaintiff are "reasonably measurable" and have been adequately proven. Defendant does not dispute that the rescission

---

**9.** A short time before the Provenance was prepared, Jenkins represented to the Defendant that Sawyer was the actually owner of the Painting. Though all inferences drawn from the underlying facts must be viewed in the light most favorable to the Defendant, *LaFond v. General Physics Servs. Corp.*, 50 F.3d 165, 171 (2d Cir.1995),

because the record as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue of material fact for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio, Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

resulted from the Marlborough's concerns about the authenticity of the Painting. That there were no known challenges to the authenticity of the Painting was a particular requirement of which the Defendant had knowledge. Accordingly, it is reasonable that Defendant should have known any subsequent buyer learning of the challenges would seek redress, and hence any lost profits could be recoverable from the Defendant. Further, the loss to Plaintiff could not have been prevented by "cover or otherwise." Accordingly, Plaintiff is entitled to damages in the sum of $950,000.00 from Defendant. Plaintiff must return the Painting to the Defendant in order to avoid duplicative recovery. *See Vernon v. Potamkin Cadillac Corp.*, 118 A.D.2d 698, 499 N.Y.S.2d 975, 976 (1986) (holding that buyer of car must surrender the vehicle and transfer title back to seller where buyer would recover damages for breach of warranty).

**D. Deposit of Money with the Court**

Plaintiff seeks to compel Defendant to deposit money with the Court pursuant to Rule 67 of the Federal Rules of Civil Procedure. Defendant argues that such a deposit is not appropriate for the case at bar.

■ Rule 67 states that:

[i]n an action in which any part of the relief sought is a judgment for a sum of money ... a party, upon notice to every other party, and by leave of the court, may deposit with the court all or any part of such sum or thing, whether or not that party claims all or any part of the sum or thing.

Fed.R.Civ.P. 67. The language of the rule does not provide the Court with the authority to compel Defendant to deposit money with the Court. Nor is there any precedent for the Court to use this rule in such a manner. The rule on its face and the supporting common law show, that Rule 67 provides for a voluntary depositing of money with the Court for reasons of stopping the compounding of interest, *Kotsopoulos v. Asturia Shipping Co.*, 467 F.2d 91 (2d Cir.1972), and interpleading. *Holborn Oil Trading Ltd. v. Interpetrol Bermuda Ltd.*, 774 F.Supp. 840, 841 (S.D.N.Y.1991); *Geler v. National Westmin-*

*ster Bank USA*, 763 F.Supp. 722, 724 (S.D.N.Y.1991). Accordingly, Plaintiff's motion to compel Defendant to deposit funds with the Court pursuant to Rule 67 of the Federal Rules of Civil Procedure is DENIED.

### III. CONCLUSION

For the aforementioned reasons, Plaintiffs motions for leave to amend the Complaint and for partial summary judgment pursuant to Rules 15(a) and 56 of the Federal Rules of Civil Procedure respectively are GRANTED. Plaintiff is to file his Amended Complaint with the Clerk of the Court within five days of receipt of this Memorandum & Order. Plaintiff's motion to compel a deposit of money to the Court by Defendant pursuant to Rule 67 of the Federal Rules of Civil Procedure is DENIED. Finally, in light of the full recovery on the warranties granted herein, the remaining causes of action of the Complaint are DISMISSED.

SO ORDERED.