David ROGATH, Plaintiff–Appellant–Cross–Appellee.

v.

Werner E.R. SIEBENMANN, Defendant–Appellee–Cross–Appellant.

Nos. 76, 543, Dockets 96–9300,96–9481.

United States Court of Appeals, Second Circuit.

Argued Aug. 28, 1997.

Decided Nov. 10, 1997.

Guy R. Fairstein, Kurzman & Eisenberg, LLP, White Plains, NY, for Plaintiff–Appellant–Cross–Appellee.

John B. Koegel and Peter A. Jaffe, Jaffe and Asher, New York City, for Defendant–Appellee–Cross–Appellant.

Before: KEARSE, McLAUGHLIN,
Circuit Judges, TRAGER, District Judge.*

McLAUGHLIN, Circuit Judge:

## BACKGROUND

This case revolves around a painting, entitled "Self Portrait," supposedly painted in 1972 by a well-known English artist, Francis Bacon.

In July 1993, defendant Werner Siebenmann sold the Painting to plaintiff David

---

* The Honorable David G. Trager, of the United States District Court for the Eastern District of New York, sitting by designation.

Rogath for $570,000. In the Bill of Sale, Siebenmann described the provenance of the Painting and warranted that he was the sole owner of the Painting, that it was authentic, and that he was not aware of any challenge to its authenticity.

Problems arose three months later when Rogath sold the Painting to Acquavella Contemporary Art, Inc., in New York, for $950,000. Acquavella learned of a challenge to the Painting's authenticity and, on November 1, 1993, requested that Rogath refund the $950,000 and take back the Painting. Rogath did so, and then sued Siebenmann in the Southern District of New York (Batts, *J.*) for breach of contract, breach of warranty and fraud.

Rogath moved for partial summary judgment on the breach of warranty claims, and the district court granted his motion. *See Rogath v. Siebenmann,* 941 F.Supp. 416, 422–24 (S.D.N.Y.1996). The court concluded that (1) Siebenmann was unsure of the provenance of the Painting when he sold it to Rogath; (2) he was not the sole owner of the Painting; and (3) when he sold the Painting to Rogath he already knew of a challenge to the Painting's authenticity by the Marlborough Fine Art Gallery in London. *See id.* The court awarded Rogath $950,000 in damages, the price at which he had sold it to Acquavella. *See id.* at 424–25. The court dismissed, *sua sponte,* Rogath's remaining claims for fraud and breach of contract "in light of the full recovery on the warranties granted herein." *Id.* at 425. Finally, a few days later, the court denied Rogath's motion to attach the money that Siebenmann had remaining from the proceeds of the initial sale to Rogath.

Siebenmann appeals the grant of partial summary judgment. Rogath cross-appeals the denial of his motion for attachment and the dismissal of his fraud and breach of contract claims.

## DISCUSSION

Siebenmann concedes that his promises and representations set forth in the Bill of Sale constitute warranties under New York law. He claims, however, that Rogath was fully aware when he bought the Painting that questions of authenticity and provenance had already been raised regarding the Painting. He maintains that, under New York law, Rogath therefore cannot rest claims for breach of warranty on the representations made in the Bill of Sale.

■ We review *de novo* the district court's disposition of Rogath's motion for partial summary judgment. *See LaFond v. General Physics Servs. Corp.,* 50 F.3d 165, 171 (2d Cir.1995). The parties agree that New York law applies.

### A. Breach of Warranty under New York Law

The Bill of Sale provides:

In order to induce David Rogath to make the purchase, Seller ... make[s] the following warranties, representations and covenants to and with the Buyer.

1. That the Seller is the sole and absolute owner of the painting and has full right and authority to sell and transfer same; having acquired title as described in a copy of the Statement of Provenance signed by Seller annexed hereto and incorporated herein; [and] that the Seller has no knowledge of any challenge to Seller's title and authenticity of the Painting....

Because the Bill of Sale was a contract for the sale of goods, Rogath's breach of warranty claims are governed by Article Two of the Uniform Commercial Code ("UCC"). *See* N.Y.U.C.C. § 2–102 (McKinney 1993); *Foxley v. Sotheby's Inc.,* 893 F.Supp. 1224, 1232–33 (S.D.N.Y.1995). Section 2–313 of the UCC provides that "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall *conform to the description.*" N.Y.U.C.C. § 2–313(1)(b) (McKinney 1993).

Whether the "basis of the bargain" requirement implies that the buyer must rely on the seller's statements to recover and what the nature of that reliance requirement is are unsettled questions. *See* Note, "Express Warranties under the Uniform Commercial Code: Is There a Reliance Requirement?" 66 N.Y.U. L.Rev. 468, 469 (1991); *see also* Annotation, "Purchaser's Disbelief

in, or Nonreliance upon, Express Warranties Made by Seller in Contract for Sale of Business as Precluding Action for Breach of Express Warranties," 7 A.L.R. 5th 841 (1992). Not surprisingly, this same confusion haunted the New York courts for a time. *See Ainger v. Michigan Gen. Corp.*, 632 F.2d 1025, 1026 n. 1 (2d Cir.1980); *CPC Int'l, Inc. v. McKesson Corp.*, 134 Misc.2d 834, 513 N.Y.S.2d 319, 322 (Sup.Ct.1987).

Some courts reasoned that the buyer must have relied upon the accuracy of the seller's affirmations or promises in order to recover. *See, e.g., City Mach. & Mfg. Co. v. A. & A. Mach. Corp.*, 1967 WL 8832 (E.D.N.Y.1967); *Scaringe v. Holstein*, 103 A.D.2d 880, 477 N.Y.S.2d 903, 904 (1984); *Crocker Wheeler Elec. Co. v. Johns–Pratt Co.*, 29 A.D. 300, 51 N.Y.S. 793, 794 (1898), *aff'd*, 164 N.Y. 593, 58 N.E. 1086 (1900); *see also County Trust Co. v. Pilmer Edsel, Inc.*, 14 N.Y.2d 617, 249 N.Y.S.2d 170, 171, 198 N.E.2d 365, 366 (1964) (Burke, J., Van Voorhis, J., and Scileppi, J., dissenting).

Other courts paid lip service to a "reliance" requirement, but found that the requirement was met if the buyer relied on the seller's promise as part of "the basis of the bargain" in entering into the contract; the buyer need not show that he relied on the truthfulness of the warranties. *See, e.g., Ainger v. Michigan Gen. Corp.*, 476 F.Supp. 1209, 1224–27 (S.D.N.Y.1979) (interpreting, in part, § 2–313), *aff'd on other grounds*, 632 F.2d 1025 (2d Cir.1980).

Finally, some courts reasoned that there is a "reliance" requirement only when there is a dispute as to whether a warranty was in fact given by the seller. These courts concluded that no reliance of any kind is required "where the existence of an express warranty in a contract is conceded by both parties." *CPC Int'l*, 513 N.Y.S.2d at 322; *see Ainger*, 476 F.Supp. at 1226–27. In these cases, the buyer need establish only a breach of the warranty.

In 1990 New York's Court of Appeals dispelled much of the confusion when it squarely adopted the "basis of the bargain" description of the reliance required to recover for breach of an express warranty. In *CBS Inc. v. Ziff–Davis Publishing Co.*, 75 N.Y.2d 496, 554 N.Y.S.2d 449, 553 N.E.2d 997 (1990), the court concluded that "[t]his view of 'reliance'—i.e., as requiring no more than reliance on the express warranty as being a part of the bargain between the parties—reflects the prevailing perception of an action for breach of express warranty as one that is no longer grounded in tort, but essentially in contract." *Id.* at 452, 553 N.E.2d at 1001. The court reasoned that "[t]he critical question is not whether the buyer believed in the truth of the warranted information ... but whether [he] believed [he] was purchasing the [seller's] promise [as to its truth]." *Id.* at 452–53, 553 N.E.2d at 1000–001 (quotations omitted and some insertions altered).

*CBS* was not decided on the basis of the UCC, probably because the sale of the magazine business at issue did not constitute the sale of goods. *See generally* 7 A.L.R.5th at 846–47; Annotation, "What Constitutes 'Goods' within the Scope of UCC Article 2," 4 A.L.R.4th 912, 921–24 (1981). Nevertheless, the court relied heavily on UCC authorities, *see CBS*, 554 N.Y.S.2d 449, 553 N.E.2d at 1000–001, expressly noting that "analogy to the Uniform Commercial Code is 'instructive'." *Id.* at 454 n. 4, 553 N.E.2d at 1002 n. 4.

In 1992, in a case also involving the sale of a business, we followed the New York Court of Appeals and delineated fine factual distinctions in the law of warranties: a court must evaluate both the extent and the source of the buyer's knowledge about the truth of what the seller is warranting. "Where a buyer closes on a contract in the full knowledge and acceptance of facts *disclosed by the seller* which would constitute a breach of warranty under the terms of the contract, the buyer should be foreclosed from later asserting the breach. In that situation, unless the buyer expressly preserves his rights under the warranties ..., we think the buyer has waived the breach." *Galli v. Metz*, 973 F.2d 145, 151 (2d Cir.1992) (emphasis added); *see In re Chateaugay Corp.*, 155 B.R. 636, 650–51 (Bankr.S.D.N.Y.1993), *aff'd*, 108 F.3d 1369 (2d Cir.1997). The buyer may preserve his rights by expressly stating that disputes regarding the accuracy of the seller's warranties are unresolved, and that by signing

the agreement the buyer does not waive any rights to enforce the terms of the agreement. *See Galli,* 973 F.2d at 150.

■ On the other hand, if the seller is not the source of the buyer's knowledge, e.g., if it is merely "common knowledge" that the facts warranted are false, or the buyer has been informed of the falsity of the facts by some third party, the buyer may prevail in his claim for breach of warranty. In these cases, it is not unrealistic to assume that the buyer purchased the seller's warranty "as insurance against any future claims," and that is why he insisted on the inclusion of the warranties in the bill of sale. *Galli,* 973 F.2d at 151; *see CBS,* 554 N.Y.S.2d 449, 553 N.E.2d at 1001–002; *see also Cipollone v. Liggett Group, Inc.,* 893 F.2d 541, 568 n. 31 (3d Cir.1990), *aff'd in part, rev'd in part on other grounds,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992); *Johnston v. Metz,* No. 87–CV–973, 1993 WL 481395, at *3 (N.D.N.Y. Nov. 18, 1993).

■ In short, where the seller discloses up front the inaccuracy of certain of his warranties, it cannot be said that the buyer—absent the express preservation of his rights—believed he was purchasing the seller's promise as to the truth of the warranties. Accordingly, what the buyer knew and, most importantly, whether he got that knowledge from the seller are the critical questions. *See Galli,* 973 F.2d at 151; *Chateaugay,* 155 B.R. at 650–51.

### 1. *What Siebenmann Knew*

Here, as the district court pointed out, Siebenmann, the seller, produced no evidence to contradict Rogath's evidence that Siebenmann knew of the cloud that hung over the Painting's authenticity before he sold it to Rogath. Siebenmann admits that he was told that the Marlborough Gallery was troubled by certain peculiarities of the Painting—including shiny black paint (as opposed to the matte black that Bacon apparently preferred) and the use of pink paint (which Bacon evidently did not use)—that suggested that Bacon was not the painter.

Siebenmann also admits that Julian Barran, a London art dealer, had earlier refused to buy the Painting because of doubts harbored by the Marlborough Gallery. Moreover, there was uncontroverted evidence that, on a prior occasion, Siebenmann's attempted sale of the Painting to a client of Robert Peter Miller, the owner of an art gallery in New York, was aborted when (1) Miller learned that the Marlborough had concerns about the Painting's authenticity, and (2) David Sylvester, a British art critic, advised Miller not to proceed with the purchase because of the Marlborough objection and because Sylvester himself was not sure of the authenticity of the Painting.

Finally, Siebenmann does not deny that in June 1993 he received a fax from Anita Goldstein, an art dealer in Zurich, Switzerland, stating that "everybody is afraid of the authenticity" of the Painting.

### 2. *What Siebenmann Told Rogath: Reasonable Inferences*

In an affidavit in opposition to Rogath's motion for partial summary judgment, Siebenmann stated that "I spoke directly with David Rogath about the controversy created by the Marlborough Gallery towards this painting." He also said that, in a phone conversation with Rogath on July 13, 1993, "I specifically mentioned Marlborough Gallery and the 'problems' or the 'controversy' that it had produced for this painting.... Mr. Rogath brushed aside the Marlborough Gallery controversy. He told me he had experienced difficulties with this particular gallery in the past and did not consider them to be especially reputable." In his deposition, Siebenmann added that he told Rogath on the phone "that I had problems with the Marlborough Gallery."

Siebenmann also filed an affidavit from Ronald Alley, the curator of the Tate Gallery in London, England, and the author of a survey of Bacon's work as well as several other writings about Bacon. Alley stated:

I was phoned by Mr David Rogath, hitherto unknown to me, who said that he was thinking of buying the painting and asked whether it was correct that I had seen it and thought it to be authentic. My reply, to the best of my recollection, can be summarized as follows: "It is a picture which

did not pass through Marlborough Fine Art and is said to have a provenance which sounds quite plausible but is more or less impossible to check. Both Ms Beston of Marlborough Fine Art and David Sylvester say they don't think it is by Bacon, but Sylvester knows it only from a photograph. I flew to Geneva for the day to look at it in a warehouse and felt convinced it was genuine."

For his part, Rogath denied that he was aware of any challenges to the authenticity or provenance of the Painting before entering into the Bill of Sale. He stated in his affidavit:

> During our telephone conversation, Mr. Siebenmann did not tell me that the Marlborough Gallery had "questioned" or "reserved judgment" about the Painting, or had caused any "problems" or "controversy" concerning the Painting. He said nothing at all like that during the conversation. Neither did Mr. Alley, in our subsequent conversation, refer to any such matters. He certainly did not tell me that Ms. Beston and Mr. Sylvester "don't think it is by Bacon." In fact, I spoke with Mr. Alley after the inauthenticity of the Painting had become known to me. . . . Had either Mr. Siebenmann or Mr. Alley hinted to me that the Painting was of questioned authenticity, it would have been a "red flag" for me, as I had no desire to spend some $600,000 dollars to purchase a painting the authenticity of which was in dispute. . . .

Here, the Bill of Sale states that the warranties induced Rogath to buy the Painting, but Rogath did not "expressly preserve his rights" under the Bill of Sale, as required by Galli. *See* 973 F.2d at 150. Accordingly, exactly what Siebenmann told Rogath is clearly crucial. *See Galli,* 973 F.2d at 151; *Chateaugay,* 155 B.R. at 650–51. On the other hand, what Alley may have told Rogath about the authenticity and provenance of the Painting is immaterial. *See Galli,* 973 F.2d at 151; *Ziff-Davis,* 554 N.Y.S.2d 449, 553 N.E.2d at 1001–002. Only if the seller, Siebenmann himself, informed Rogath of doubts about the provenance or challenges to authenticity will Rogath be deemed to have waived any claims for breach of warranty arising from the written representations appearing in the Bill of Sale. *See Galli,* 973 F.2d at 151; *Chateaugay,* 155 B.R. at 650–51.

As Rogath emphasizes, Siebenmann nowhere specifically alleges that he informed Rogath of his doubts about the authenticity and provenance of the Painting. He merely alluded to the "controversy" or "problems" with the Marlborough Gallery. Still, Siebenmann's testimony, however ambiguous, may justify the inference that Rogath knew more than he now claims to have known when he entered into the Bill of Sale.

■ At the very least, there is indisputable ambiguity in the affidavits about the pivotal exchange between Rogath and Siebenmann. We are satisfied that genuine issues of fact persist. In this posture, we must draw all reasonable inferences in Siebenmann's favor. *See LaFond,* 50 F.3d at 171. Accordingly, as regards the Marlborough challenge, summary judgment on Rogath's claims for breach of the warranties of provenance and no challenges to authenticity is inappropriate. *Cf. Dotson v. City of Indianola, Ms.,* 739 F.2d 1022, 1025–26 (5th Cir. 1984); *Waldie v. Schlesinger,* 509 F.2d 508, 510 (D.C.Cir.1974); *Union Ins. Soc'y of Canton, Ltd. v. William Gluckin & Co.,* 353 F.2d 946, 953 (2d Cir.1965).

### 3. *What Sylvester Said*

■ Sylvester's doubts about the Painting also cannot justify summary judgment for Rogath, but for different reasons. Siebenmann was aware that "Sylvester advised Miller not to proceed with the purchase of the Painting because of the 'Marlborough objection and that he wasn't sure himself of the authenticity of the painting.'" Siebenmann did not claim to have disclosed to Rogath Sylvester's statement. Indeed, in his affidavit opposing Rogath's summary judgment motion, Siebenmann stated that he did not consider Sylvester's doubts to be a challenge. Siebenmann's nondisclosure could constitute a breach of warranty—but only if Sylvester's statement was a "challenge" to authenticity. We conclude that the question of whether Sylvester's statement constituted a challenge poses factual issues for trial.

■ A contractual term is ambiguous where it may be ascribed "conflicting reasonable interpretations." *Mellon Bank, N.A. v. United Bank Corp. of N.Y.,* 31 F.3d 113, 116 (2d Cir.1994). "As a general matter, we have held that when a contract is ambiguous, its interpretation becomes a question of fact and summary judgment is inappropriate." *Id.*

Although the parties apparently agree as to what Sylvester said, reasonable minds could differ as to whether what he said constituted a challenge apart from the Marlborough challenge. Sylvester's recommendation that the buyer not proceed "because of the Marlborough objection" could reasonably be interpreted as merely advice to heed the Marlborough challenge. Further, a rational juror could interpret the statement that "[Sylvester] wasn't sure" as evincing an ambivalence on the part of Sylvester that did not rise to the level of a challenge, especially given that Sylvester himself had not seen the Painting, but only photographs of it.

In this context, moreover, the term may well be a specialized one. It is hardly clear as a matter of law that "challenge" includes every mention by one person of the fact that a challenge has been made by another person (or, for example, that it would include Anita Goldstein's statement that "everybody is afraid of the authenticity" of the Painting). Nor is it clear as a matter of law whether the term "challenge" would include an expression of uncertainty by someone who had never seen the painting in question. If Siebenmann proffers art-industry or other evidence as to the meaning of this ambiguous contract term, its meaning will be a question for the jury at trial. *See In Time Prods., Ltd. v. Toy Biz, Inc.,* 38 F.3d 660, 665 (2d Cir.1994); *Mellon Bank,* 31 F.3d at 116.

### B. *No Alternate Basis for the Damages Award*

■ The district court also concluded that Siebenmann breached the warranty of ownership of the Painting. The court did not specify, however, whether this breach contributed to the collapse of the resale to Acquavella. Was there a cause and effect relationship? We cannot say, based on the evidence before us, that the breach of this warranty resulted in the failed Acquavella sale and caused Rogath's damages.

It appears from the record that Acquavella was more concerned over whether Bacon was the painter than whether Siebenmann was the owner of the Painting. In aborting the sale, Acquavella sent to Rogath a copy of a fax from Valerie Beston, the managing director of the Marlborough Gallery, in which Beston opines at the outset of her letter that the Painting is an "outright fake." There is also some evidence that the Acquavella may have been concerned with the provenance of the Painting. In her letter, Beston goes on to describe the provenance as "dubious."

There is no evidence, however, that Acquavella's concern about Siebenmann's title to the Painting fueled the failed sale.

### C. *Rogath's Cross–Appeal*

The district court dismissed, *sua sponte,* Rogath's claims for fraud and breach of contract "in light of the full recovery on the warranties granted herein." *Rogath,* 941 F.Supp. at 425. In light of our vacatur of Rogath's award for breach of warranty, on remand to the district court we reinstate Rogath's claims for fraud and breach of contract. Finally, on remand Rogath, if so advised, is free to move for attachment, under Federal Rule of Civil Procedure 64.

### CONCLUSION

The order granting Rogath's motion for partial summary judgment is vacated, and the case is remanded to the district court for disposition not inconsistent with this opinion.