**PARACO GAS CORPORATION, Patrick Armentano and Joseph Armentano, Plaintiffs–Counterclaim–Defendants,**

v.

**AGA GAS, INC., Defendant–Counterclaimant.**

**JMR Enterprises, Ltd., Additional Defendant on the Counterclaim.**

**No. 01 Civ. 9971(MBM).**

United States District Court, S.D. New York.

March 14, 2003.

Vincent Deiorio, The Vincent A. Deiorio Law Firm, Purchase, NY, for Plaintiff–Counterclaim–Defendants.

John–Patrick Curran, Tannenbaum Helpern Syracuse & Hirschtritt LLP, New York, NY, for Defendant–Counterclaimant.

## OPINION AND ORDER

MUKASEY, District Judge.

Paraco Gas Corporation ("Paraco Gas") and Patrick and Joseph Armentano ("the Armentanos") sued AGA Gas, Inc. ("AGA") in the Supreme Court of the State of New York alleging breach of contract. AGA removed the case to this court based on diversity of citizenship.[1] AGA asserts counterclaims against Paraco, JMR Enterprises, LTD ("JMR"), and the Armentanos for breach of contract and indemnification, and against Paraco and JMR for strict liability under Section 181 of the New York Navigation Law. AGA moves for summary judgment pursuant to Fed. R.Civ.P. 56. For the reasons stated below, AGA's motion is granted with respect to the breach of contract and indemnification claims as to liability.

### I.

The following facts are based primarily on the documents submitted by the parties and AGA's Rule 56.1 Statement. Paraco, JMR, and the Armentanos ("counterclaim defendants") add several additional facts and give a blanket denial of many of AGA's factual assertions. (See Counterclaim Def.'s 56.1 ¶ 11 (stating that they "disagree with and controvert" paragraphs 11 through 35 of AGA's 56.1 Statement)) To the extent that they dispute particular assertions, these disputes are noted.

This action arises out of AGA's purchase from Paraco and JMR of a business and a parcel of real property (the "Property")

---

1. AGA is an Ohio corporation with its principal place of business in Ohio. (Counterclaims ¶ 1) Paraco and JMR are both New York corporations with their principal places of business in New York. (Counterclaims ¶¶ 2–3; Reply to Counterclaims ¶ 2) Patrick Armentano and Joseph Armentano are both citizens of the State of New York who reside in New York. (Counterclaims ¶¶ 4–5; Reply to Counterclaims ¶ 2)

located at 25 Warren Place in Mount Vernon, New York. The half-acre lot has a separate address at 24 Roslyn Place, as the lot has frontage on both streets. (AGA's 56.1 ¶¶ 6–7; Muller–Thym Aff. ¶ 8)

Prior to December 1996, JMR was the owner of the Property and Paraco used the Property for its industrial gas and welding supply business. (AGA's 56.1 ¶ 6) In 1994, the New York State Department of Environmental Conservation ("NYSDEC") notified Paraco that a 2000–gallon diesel underground storage tank ("UST") located at the southern portion of the Property had failed a tank tightness test. (Muller–Thym Aff. ¶ 10) Paraco hired National Environmental Specialists, Inc. ("NES") to remove the UST. (AGA's 56.1 ¶ 8) NES removed the UST along with 25 tons of contaminated soil from the Property, backfilled the hole with sand, and topped the excavation with asphalt. (AGA's 56.1 ¶ 9; Muller–Thym Aff., Ex. D)

On or about November 3, 1996, AGA entered into an agreement (the "Agreement") with Paraco and JMR (the "Sellers") to buy the Property along with Paraco's industrial gas and welding supply business and other personal property. Patrick and Joseph Armentano, shareholders of Paraco and JMR, were also parties to the Agreement. (Compl. ¶ 4; Ans. ¶ 4; AGA's 56.1 ¶ 10, Muller–Thym Aff., Ex. E) Paragraph 14 of the Agreement listed the "Sellers' Representations and Warranties." Paragraph 14(p) of the Agreement provided in pertinent part:

> Paraco's Industrial Gas and Welding Supply Business has been conducted, and currently is conducted, in a manner, to generate, refine, transport, treat, store, handle, dispose, transfer, produce or process all Contaminants, in any manner that complies with all applicable Environmental laws, except as disclosed in *Schedule 18.* Except as disclosed in *Schedule 18,* Sellers have not been engaged, at any time, and currently is not engaging in any activity (nor is failing to act) in a manner that has resulted or may result in a Release, or threat of a Release, into the Environment of a Contaminant in any quantity regulated by law.
>
> Except as disclosed in *Schedule 18* and with respect to the Locations of Paraco's Industrial Gas and Welding Supply Business:[2]
>
> (1) no Contaminant has been disposed of, generated on, treated on, buried beneath, or percolated beneath, and no disposal, generation, treatment, burial or percolation has been threatened in or near any real property previously or currently owned, leased, or used by Sellers;
>
> (2) no real property previously or currently so owned, leased or used by Sellers, contains or has contained any underground storage tank; and
>
> (3) Sellers have not received any Notice pertaining to any asserted violation of any Environmental law.
>
> Any underground storage tank removed from the Mt. Vernon Location, was removed in accordance with Environmental law.

(Muller–Thym Aff., Ex. E, ¶ 14(p)) Schedule 18 to the Agreement disclosed the presence of an underground storage tank only at the Brooklyn location and not at the Property in Mount Vernon. (Muller–Thym Aff., Ex. F)[3] The Agreement defined "Contaminant" as follows:

---

2. "Locations" under the Agreement refers to the Property at issue in this litigation in Mount Vernon and another piece of property not at issue in Brooklyn, New York.

3. Schedule 18 contained also, under the heading "Disclose release or threat of release of containment," "Diesel tank removal 1994— see attached." (Muller–Thym Aff., Ex. F) Neither party refers to this provision or has pro-

"Contaminant"—means (i) any substance defined as hazardous under CERCLA § 101(14), (ii) any other substance deemed hazardous by the United States Environmental Protection Agency pursuant to CERCLA § 102(a), (iii) petroleum (including crude oil or any fraction thereof), (iv) any substance deemed hazardous pursuant to RCRA § 1004(5), or (v) any other hazardous or toxic substance, material, compound, mixture, solution, element, pollutant, or waste regulated under any Environmental law.

(Muller–Thym Aff., Ex. E, ¶ 14(p))

Paragraph 20 of the Agreement contained the following indemnification provision:

INDEMNIFICATION: Sellers, Patrick Armentano, and Joseph Armentano shall indemnify and defend AGA against any claim, loss, damage, cost or expense (including those resulting from any legal proceeding) that is incurred by AGA and that results from (i) the failure of Sellers to timely pay any liability of Sellers that are not expressly assumed by AGA under this Agreement; (ii) any breach of warranty, misrepresentation or nonfulfillment of any obligation on the part of Sellers or Shareholders contained in this Agreement, or in any document or list delivered or to be delivered in connection with this Agreement; (iii) any claim described in attached *Schedule 20;* and those matters of indemnification set forth in Sections 5 and 22.

The duty of Patrick Armentano and Joseph Armentano to indemnify and defend AGA (i) shall apply only to collection of any unpaid final judgment or balance thereof obtained by AGA against Sellers and only after exhausting all recourse and recovery against Sellers and all of their assets, and (ii) is conditioned upon AGA commencing a legal proceeding for indemnification against Sellers (or either of them) within four years of the date of the Closing. As to those claims for indemnification against Sellers where AGA makes a written demand after the fourth anniversary of the Closing, the guarantee of payment of Patrick Armentano and Joseph Armentano shall expire and is unenforceable. AGA may set off the amount of any claim for indemnification under this paragraph against any payments that AGA owes to Sellers, including any lease payments, payments that are due under Exhibit "I", and any noncompetition agreement payments due Sellers.

(Muller–Thym Aff., Ex. E, ¶ 20)

As part of the Agreement, AGA agreed to pay Paraco $1,270,200 over a period of seven years for a covenant not to compete. (Compl. ¶ 5; Muller–Thym Aff., Ex. E, ¶ 6) AGA agreed to pay $98,000 to each of the Armentanos over a period of seven years for covenants not to compete. (Compl. ¶ 5 & Ex. B; Ans. ¶ 5)

In connection with AGA's purchase of the Property from JMR, AGA hired URS Corporation ("URS") to perform a Phase I and Phase II Environmental Site Assessment ("ESA") of the Property.[4] The Phase I Report stated that the Mount Vernon Fire Department indicated that a 550–gallon UST was located on the Prop-

duced any attachment to Schedule 18. Schedule 18 listed also contaminants involved in Paraco's business at the Mt. Vernon location including "15W40 oil" and "Fuel Guard—diesel additive." (*Id.*)

4. A condition precedent to the Agreement was that AGA receive "an environmental assessment report" prepared "by an engineering firm of AGA's selection" together with, if requested by AGA, "a favorable opinion letter of AGA's legal counsel" to "the effect that the Locations do not violate any Environmental laws, and that no remediation is required with respect to the Locations." (Muller–Thym Aff., Ex. E, ¶ 21(j))

erty. (Muller–Thym Aff. ¶ 17 & Ex. G, at 19) The Phase II Report said that URS took three soil samples from the Property. The first soil boring, MB–1, was from the site of the former 2000–gallon UST on the southern end of the Property near Warren Place; MB–2 was taken from the middle of the Property to the east of a concrete loading platform; and MB–3 was from the northern end of the Property near Roslyn Place. (Muller–Thym Aff., Ex. G, tbl.3) URS detected low concentrations of Volatile Organic Compounds ("VOCs") in MB–1, but these levels were well below NYSDEC Recommended Soil Cleanup Objectives. URS detected Diesel Range Organic Compounds ("DROs") and Gasoline Range Organic Compounds ("GROs") in MB–1 and MB–3, but at low concentrations. The only area of concern was MB–2, where URS detected relatively high levels of DROs.[5] (Muller–Thym Aff. ¶ 18 & Ex. G, at 20–21)

On or about December 2, 1996, AGA, Paraco, JMR, and the Armentanos executed a Second Amendment to the Agreement ("Second Amendment"). The Second Amendment provided: "AGA will not purchase the Mt. Vernon Location on the Closing," but if the investigation and remediation of the MB–2 Site "is confirmed before 36 months following the Closing, then AGA shall purchase, and JMR shall sell and convey to AGA, the Mt. Vernon Location." (Muller–Thym Aff., Ex. H, ¶¶ 3–4) The Second Amendment provided that the Sellers would engage an environmental consulting and engineering firm "for the purpose of continuing the investigation of the MB–2 Site as recommended" by URS. "If federal or state law requires remedial action at the MB–2 Site, then Sellers shall cause such remedial action to occur as soon as practicable, at Sellers' sole cost and expense." (Muller–Thym Aff., Ex. H, ¶ 1) Finally, the Second Amendment provided:

> In addition to any other indemnity provisions in the Agreement, Sellers, Patrick Armentano, and Joseph Armentano shall indemnify and defend AGA against any claim, loss, damages, cost or expense (including those that result from any legal proceeding) that is incurred by AGA and that results from (i) any underground storage tanks that are located upon the [Property] as of the Closing, or that were located upon the [Property] prior to the Closing, and any contaminated soil surrounding the underground storage tanks on or prior to the Closing, and (ii) any Contaminant located at or near, or originating from, the MB–2 Site, on or prior to the Closing.

(*Id.,* ¶ 5)[6] The "Closing"—the sale of the business and other assets—occurred on December 2, 1996. The sale of the Property was delayed pending the environmental investigation. (AGA's 56.1 ¶ 16 n.1)

Paraco hired Trade–Winds Environmental Restoration, Inc. ("Trade–Winds") in or about January 1997 to conduct further investigation of the MB–2 site. Trade–Winds, in a letter dated May 27, 1997,

---

5. URS reported that the DRO concentration in MB–2 "would be considered a significant finding by the NYSDEC and warrants further investigation." (Muller–Thym Aff., Ex. G, at 21)

6. The Second Amendment also added a paragraph to the "additional covenants" section of the Agreement, stating in pertinent part: "If AGA locates an underground storage tank upon the Mt. Vernon Location, then Sellers shall promptly cause all appropriate action to be taken with respect to the underground storage tank ('UST'), as required by applicable law, all at Sellers' cost, including (i) abandoning the UST in accordance with applicable law, (ii) removing the UST if removal is required by applicable law, or (iii) upgrading the UST in order to conform to applicable law." (Muller–Thym Aff., Ex. H, ¶ 1) Neither party refers to this provision of the Second Amendment.

reported that it did not detect DROs and concluded that the concentration of this compound detected by URS was "an anomaly that may have been the result of cross contamination from surface asphalt or some other source." (J. Armentano Aff., Ex. J; Muller–Thym Aff. ¶ 22) Trade–Winds did detect "total petroleum hydrocarbons" ("TPHs"), but concluded that because the NYSDEC did not have "any guidelines governing the acceptable levels of TPH in soil or groundwater," no further work was warranted. (J. Armentano Aff. ¶ 9 & Ex. J; Counterclaim Def.'s 56.1 ¶ 3)

In January 1997, AGA hired URS to look for the 550–gallon UST. URS did not detect the UST with metal detectors and excavation of test pits. (Muller–Thym Aff. ¶ 23 & Ex. I) Counterclaim defendants assert that AGA requested that Paraco submit the URS report regarding the failure to locate the UST to the Mount Vernon Fire Department and obtain a letter indicating that there was no UST on the Property. (Counterclaim Def.'s 56.1 ¶ 2)

AGA acquired title to the Property on September 26, 1997. (AGA's 56.1 ¶ 16 n.1) AGA operated an industrial gas and welding supply business at the Property until early 2001 when it closed the business and began to look for a buyer for the Property. During its ownership of the Property, AGA says that it did not install or operate any UST or above-ground petroleum storage tank at the Property. (*Id.* ¶ 18)

On June 3, 2001, AGA entered into an agreement to sell the Property to Town Holding Company ("Town Holding"). The agreement was subject to termination by Town Holding if the environmental conditions at the Property were not satisfactory. (*Id.* ¶ 19)

Town Holding hired ATC Associates Inc. ("ATC") to perform a Phase I and Phase II ESA of the Property. ATC took soil samples and found that five borings indicated contamination above the NYS-DEC Recommended Soil Cleanup Objectives. (Muller–Thym Aff., Ex. J, at 28) Three of these samples showed petroleum contamination in the vicinity of the former 2000–gallon UST at the southern end of the Property. The other two samples were located to the north of the concrete loading platform, near Roslyn Place. (*Id.* at 28–32 & fig. 3) ATC recommended excavation of the contaminated soils in both of these areas.

By a letter dated August 2, 2001, addressed to Joseph Armentano, AGA notified Paraco and JMR of ATC's findings. The letter stated that AGA was "putting Sellers on notice of a potential claim pursuant to the indemnification provisions of the Paraco to AGA sale agreement." (Muller–Thym Aff. ¶ 27 & Ex. K)

AGA hired URS to excavate contaminated soil at the Property. Christopher F. Schmitt, a "Senior Environmental Scientist" with URS, stated that URS consulted with Todd Ghiosay, the NYSDEC case manager, concerning the proposed excavation and "it was agreed that the excavation of the contaminated soils was an acceptable method to remediate the contamination." (Schmitt Aff. ¶ 5)

On August 10, 2001, AGA forwarded a copy of URS's excavation proposal to Patrick V. DeIorio, attorney for the counterclaim defendants. (Muller–Thym Aff. ¶ 28 & Ex. L) By a letter dated August 15, 2001, AGA notified DeIorio of AGA's indemnification claim and stated that the counterclaim defendants could have an observer present during the remediation process. The letter stated also that AGA intended to exercise the set-off provision of the Agreement if the counterclaim defendants did not indemnify AGA. (J. Armentano Aff., Ex. O)

On August 16, 2001, URS began excavation on the northern end of the Property,

in the area where ATC had detected contaminants above NYSDEC levels. During the excavation, URS found a previously undiscovered UST, located near the foundation of a house that had been on the 24 Roslyn Place portion of the Property. (AGA's 56.1 ¶ 22; Schmitt Aff. ¶ 6) URS believed this 500–gallon UST was the tank that had been listed in the Mount Vernon Fire Department database. (Schmitt Aff. ¶ 6) AGA asserts that it notified DeIorio of the discovery of this UST and URS's intention to remove it immediately. (Muller–Thym Aff. ¶ 33) Schmitt stated that "[n]umerous holes were observed in the shell of the UST and obviously contaminated soil was observed immediately adjacent to and beneath the UST." (Schmitt Aff. ¶ 7) In addition, URS "observed petroleum on the sides of the UST and in the soils immediately adjacent to and under the UST." (*Id.*)

Schmitt stated that URS screened each bucket of excavated soil with a hand-held photoionization detector ("PID") for the presence of VOCs. The PID readings of VOCs are measured against a background standard, and a reading above the background standard are "a typical sign of petroleum contamination." (*Id.* ¶ 8) URS found that PID readings at depths greater than 4 feet below ground in this area showed elevated levels of VOCs, whereas readings at more shallow depths showed no such elevated levels. (*Id.*) URS found groundwater in this area, which it said had to be removed to excavate contaminated soils located at depths below the groundwater. (Muller–Thym Aff., Ex. M, at 8–9)

URS also excavated the southern end of the Property at the site of the former 2000–gallon UST, where ATC had detected contaminants above NYSDEC levels. During excavation, URS found the steel supply line and vent piping for the former UST. (AGA's 56.1 ¶ 23; Schmitt Aff. ¶ 10) URS reported that the piping had not

been capped or removed as required by NYSDEC regulations. (*Id.*) URS found that the sand backfill material used by NES to fill the excavation in 1994 did not indicate the presence of VOCs at elevated levels. However, the soil immediately adjacent to the sand backfill showed higher concentrations of VOCs. (Schmitt Aff. ¶ 11)

URS finished excavation of the Property on September 6, 2001. URS concluded that the source of the petroleum contamination in these areas of the Property were the USTs:

> The source of the petroleum contamination encountered in the rear of the Property was the 500–gallon UST that URS excavated in August 2001. As set forth above, significant petroleum contamination was observed in, around and beneath the UST during excavation activities. Moreover, no signs of contamination were detected between the ground surface and approximately 3.5 feet below grade, thereby ruling out any other source of petroleum contamination such as a surface spill.

(Schmitt Aff. ¶ 17; *see also* Muller–Thym Aff., Ex. M, at 13) URS concluded also:

> [T]he source of the petroleum encountered in the front of the Property was the former 2,000–gallon diesel fuel UST that was reportedly removed by NES in 1994. Obvious signs of contamination were observed in the native soils immediately adjacent to the sandy backfill material installed by NES upon completion of the excavation of the 2,000–gallon UST in December 1994. Moreover, the petroleum contamination could not have come from another source, such as surface spill, since no petroleum contamination was detected in the first 4 feet of soil below ground surface and, prior to commencement of the front excavation, the entire area of the front of the Property was covered with impervious sur-

faces including asphalt and concrete sidewalks.

(Schmitt Aff. ¶ 16; *see also* Muller–Thym Aff., Ex. M, at 13)

URS took 20 post-excavation soil samples. Although some samples had concentrations that exceeded the NYSDEC Recommended Soil Cleanup Objectives, Schmitt asserted that "all accessible contaminated soil has been removed from the Property with only residual concentrations remaining in areas that were not accessible due to property lines, building foundations, or existing utilities." (Schmitt Aff. ¶ 15)

URS's work on the Property included: "the closure and removal of a 500–gallon underground storage tank, the excavation and off-site disposal of 943.79 tons of petroleum contaminated soil, the off-site disposal of 12,950 gallons of petroleum contaminated groundwater, and the collection and laboratory analysis of twenty post-excavation soil samples." (Muller–Thym Aff., Ex. M, at 13)

AGA informed NYSDEC of the remediation process and gave them a copy of URS's final report. (Schmitt Aff. ¶ 18) On October 16, 2001, Todd Ghiosay of NYSDEC issued a letter to AGA indicating that "no further action is required at this time." (Muller–Thym Aff., Ex. N; Schmitt Aff. ¶ 18)

Counterclaim defendants assert that soil was excavated and removed from the Property even though "there was no order from the NYSDEC." (Counterclaim Def.'s

56.1 ¶ 9; J. Armentano Aff. ¶ 17) They claim also: "Upon examination of the findings of the 2001 environmental assessment it can be determined that the soil contamination detected in 2001 is no different from the contamination detected in 1996. There were no substantial changes in the environmental condition at the site between 1996 and 2001." (Counterclaim Def.'s 56.1 ¶ 10) They add: "A full 40% of all the soil removed from the site could have been reused on the site. It was removed [from] the site for reasons other than contamination." (*Id.*) [7]

Paraco and the Armentanos sued in the Supreme Court of the State of New York, Westchester County, alleging that on or about October 1, 2001, AGA breached its obligations pursuant to the non-competition agreements by failing to pay Paraco and the Armentanos ("plaintiffs"). Plaintiffs allege that AGA owes Paraco $96,000 and each of the Armentanos $35,000, plus statutory interest from October 1, 2001. (Compl.¶ 7–9) [8]

AGA removed the case to this court and asserted counterclaims against Paraco, the Armentanos, and JMR for breach of contract and indemnification, and against Paraco and JMR for strict liability under Section 181 of the New York Navigation Law. AGA says that it has withheld payments "pursuant to a right of set-off contained in Paragraph 20 of the Agreement." (Ans.¶ 7) AGA asserts that it has incurred costs of $149,099.63 to remediate the environmental conditions at the Property.

---

**7.** Counterclaim defendants cite generally to four exhibits and do not point to a specific cite for the 40% figure or the "other reason."

**8.** Plaintiffs allege in their second cause of action that but for the assurances of and payments by AGA they would not have entered into the non-competition agreements, and because of these agreements they "have been economically compromised and preclud-

ed from engaging in aforestated business and economic enterprises of a like nature to their detriment since Nov. 1966[sic] and reserve the right to prove and establish all their economic losses and damages resulting therefrom." (Compl.¶ 11–12) Plaintiffs allege in their third cause of action that AGA's refusal to pay is a "breach of good faith and fair dealing" and ask for attorneys fees and punitive damages. (Compl.¶ 14)

(Counterclaims ¶ 30) It also alleges damages including: 1) "an unknown sum to be established at time of trial for the loss of the sale of the Property to [Town Holding] due to the pollution conditions at the Property"; 2) "an unknown sum to be established at time of trial for diminution in the value of the Property as the result of pollution conditions at the Property"; and 3) an unknown sum to be established at time of trial for attorneys' fees and other litigation expenses." (*Id.*)

AGA moves for summary judgment pursuant to Fed.R.Civ.P. 56. AGA does not mention its claim under New York Navigation law in its memorandum in support of summary judgment, and I have not considered this claim in connection with AGA's motion. For the reasons stated below, summary judgment is granted to AGA on its breach of contract and indemnification claims as to liability.

### II.

Summary judgment is appropriate when, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Horn & Hardart Co. v. Pillsbury Co.,* 888 F.2d 8, 10 (2d Cir. 1989). The movant for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion" and identifying which materials "demonstrate the absence of genuine issues of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once this showing has been made, the burden shifts to the non-movant who "must set forth facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Conclusory allegations will not suffice to create a genuine issue." *Delaware & Hudson Ry. v. Con-*

*solidated Rail Corp.,* 902 F.2d 174, 178 (2d Cir.1990).

### A.   Second Amendment

█   The indemnity provision in the Second Amendment states:

In addition to any other indemnity provisions in the Agreement, Sellers [Paraco and JMR], Patrick Armentano, and Joseph Armentano shall indemnify and defend AGA against any claim, loss, damages, cost or expense (including those that result from any legal proceeding) that is incurred by AGA and that results from (i) any underground storage tanks that are located upon the [Property] as of the Closing, or that were located upon the [Property] prior to the Closing, and any contaminated soil surrounding the underground storage tanks on or prior to the Closing, and (ii) any Contaminant located at or near, or originating from, the MB–2 Site, on or prior to the Closing.

(Muller–Thym Aff., Ex. H, ¶ 5)

Under this provision, counterclaim defendants must indemnify AGA for the cost of removing the 500–gallon UST. Counterclaim defendants do not dispute that this UST was located on the Property prior to the Closing. The cost of removal is a cost "incurred by" AGA that "resulted from" the UST, and thus is covered by the Second Amendment's indemnity provision. AGA also paid for removal of contaminated soil in the northern end of the Property surrounding the 500–gallon UST. URS found that the 500–gallon UST was the source of these contaminated soils, and counterclaim defendants have presented no facts to dispute this conclusion. The cost of removing the soil is a cost that "resulted from" the UST, and counterclaim defendants must indemnify AGA for this cost.

URS discovered during excavation of the site of the former 2000–gallon UST that pipe had not been capped or removed as required by NYSDEC regulations.[9] Counterclaim defendants do not dispute this fact. The cost incurred by AGA in removing the pipe is a cost that "resulted from" a UST that was present on the Property before the Closing, and thus is covered by the indemnity provision. URS also discovered contamination surrounding the site of the former 2000–gallon UST and concluded that the UST was the source of the contamination. Counterclaim defendants have asserted no facts to rebut this conclusion. AGA's expenses in removing the contaminated soil resulted from the presence of the UST on the Property prior to Closing, and thus the counterclaim defendants have a duty under the Second Amendment to indemnify AGA for these costs.[10]

Counterclaim defendants' only argument against summary judgment for AGA appears to be that "[a]ny contamination encountered during the 2001 excavation of the site was known to have existed by AGA prior to the closing of title in 1996 and remained virtually unchanged from that time on." (Counterclaim Def.'s Mem. at 6)[11]

Counterclaim defendants appear to be arguing that if AGA knew about contamination on the Property prior to buying it, then AGA should not be indemnified for the cost of eliminating the contamination. As discussed below, AGA's knowledge of contamination prior to the sale of the Property is potentially relevant to AGA's breach of warranty claim under the Agreement. However, AGA's prior knowledge of any contamination does not bear on counterclaim defendants' duties under the Second Amendment. The Second Amendment contains no provision that makes AGA's knowledge relevant.

In their Rule 56.1 Statement, counterclaim defendants state that AGA removed soil from the Property even though "there was no order from NYSDEC." However, they do not argue in their memorandum that the Second Amendment covers only costs associated with remediation required by law or imposed by NYSDEC order. As AGA points out, New York regulations required AGA to report the discovery of the petroleum contamination to the NYSDEC. AGA's communication with NYSDEC during the remediation and the "No Further Action" letter issued by NYSDEC when remediation was complete are consistent with the possibility that the cleanup

9. AGA cites § 613.9 of Title 6 of the Official Compilation of Codes, Rules and Regulations of the State of New York, which provides:

   (b) Closure of tanks permanently out of service.
   (1) Any tank or facility which is permanently out of service must comply with the following:

   .     .     .     .     .

   (iii) All connecting lines must be disconnected and removed or securely capped or plugged. Manways must be securely fastened in place.

10. Counterclaim defendants could have argued that the Second Amendment's indemnity provision was not intended to cover costs

associated with the 2000–gallon UST but rather was meant to cover only costs associated with a UST discovered after execution of the Amendment. However, counterclaim defendants assert no such argument, and under a plain reading of the indemnity provision costs associated with the 2000–gallon UST are covered.

11. They state also: "There is no credible evidence of a pre–1997 release of contaminates on the site, there is no credible evidence of any new contamination on the site (AGA was aware of the existing contamination at the completion of the environmental site assessments in 1997), there were no new 'reportable quantities' contamination on the site . . . ." (Counterclaim Def.'s Mem. at 5–6)

was compelled by the agency. However, whether the agency mandated the remediation need not be resolved because the Second Amendment includes no such requirement.

Counterclaim defendants' indemnity duties under the Second Amendment have no time limit. Under the original Agreement, the indemnity duties of the Armentanos extended for only four years after the Closing. Counterclaim defendants do not attempt to argue that this time limit applies to the duties of the Armentanos under the Second Amendment. The indemnity provision in the Second Amendment is a separate and additional provision, and the Second Amendment contains no language subjecting that provision to the time limit in the original Agreement.

Summary judgment is granted to AGA under the Second Amendment's indemnity provision as to liability. AGA has established that the petroleum contamination on the Property in the areas excavated by URS originated from the USTs. (*See* AGA's 56.1 ¶ 25 & 27; Schmitt Aff. ¶¶ 16–17; Muller–Thym Aff., Ex. M, at 13–14) Counterclaim defendants fail to raise an issue of material fact regarding the source of this contamination. Therefore, Paraco, JMR, and the Armentanos must indemnify AGA for the cost of removing the contamination. They must pay also the cost of removing the 500–gallon UST and the pipe from the 2000–gallon UST. AGA asserts that it spent $149,099.63 "to remediate the environmental conditions at the Property." (AGA's 56.1 ¶ 29) However, AGA does not explain the components of this figure and never directly asserts that all of these costs were to remedy problems caused by the USTs. The amount owed to AGA can be determined after AGA provides facts that establish the connection between particular costs and the USTs.[12]

## B. Original Agreement

The Armentanos are not liable under the indemnity provisions of the original Agreement. Their indemnity duties were "conditioned upon AGA commencing a legal proceeding for indemnification against Sellers (or either of them) within four years of Closing." (Muller–Thym Aff., Ex. E, ¶ 20) The "Closing" occurred in December 1996, over four years before the events that form the basis for AGA's indemnity claim. Any claims against the Armentanos based on the indemnity provision in the original Agreement have expired.

In October 2001, AGA stopped paying the Armentanos for their non-competition agreements. (Compl.¶ 7–8) AGA alleges that it withheld payments pursuant to the set-off provision in the Agreement. (Ans.¶ 7) However, withholding payments appears to have been improper both because the Armentanos' indemnity duties under the Agreement had expired and because the set-off provision does not apply

---

12. Counterclaim defendants state in their Rule 56.1 Statement: "A full 40% of all the soil removed from the site could have been reused on the site. It was removed [from] the site for reasons other than contamination." (Counterclaim Def.'s 56.1 ¶ 10) This general statement fails to explain any particular "other" reason why the soil was removed, and counterclaim defendants do not explain this statement or even refer to it in their memorandum. Counterclaim defendants follow the statement with general citations to four exhibits, and it is not apparent where in these exhibits they find support for the statement. In any event, under the Second Amendment, counterclaim defendants must pay AGA for the costs associated with the USTs, including the cost to remove contamination caused by the USTs. To the extent that counterclaim defendants are claiming that some costs incurred by AGA did not result from the USTs, this issue can be resolved when damages are calculated. Counterclaim defendants' statement is not relevant to their liability under the Second Amendment.

to payments owed to the Armentanos. Under that provision, "AGA may set off the amount of any claim for indemnification under this paragraph against any payments that AGA owes to Sellers, including . . . any noncompetition agreement payments due Sellers." (Muller–Thym Aff., Ex. E, ¶ 20) This provision allows AGA to set off payments owed to Sellers—defined under the Agreement as Paraco and JMR—but not the payments owed the Armentanos. However, the Armentanos have not moved for a summary judgment on their claim to recoup this set-off.

The Sellers' indemnity duties under the Agreement have no time limit. The Sellers promised to "indemnify and defend AGA against any claim, loss, damage, cost or expense (including those resulting from any legal proceeding) that is incurred by AGA and that results from . . . any breach of warranty, misrepresentation or nonfulfillment of any obligation on the part of Sellers or Shareholders contained in this Agreement." AGA sues for breach of warranty and for indemnification under this provision. (Compl. ¶ 24–39)

The indemnity provision of the Agreement covers the same costs as the Second Amendment's indemnity provision. Under the Agreement, the Sellers warranted that there were no USTs on the Property and that any prior USTs had been removed properly. If Sellers have a duty to indemnify under the Agreement, they will have to pay the cost of removing the 500–gallon UST and removing the pipe from the 2000–gallon UST. These same costs are covered by the Second Amendment. Sellers' indemnity duties under the Agreement would also include the cost of removing contamination from the Property, as they warranted there was no Contaminant on the Property. The Second Amendment covers this same cost, as AGA has established that the contamination removed by URS came from the USTs.

Although the indemnity provisions of the original Agreement and the Second Amendment cover the same costs, the Second Amendment contained no set-off provision. Therefore, AGA had a right to withhold payments from the Sellers only if the Sellers had a duty to indemnify under the Agreement.

■ Counterclaim defendants assert that AGA knew about contamination on the Property prior to the sale. AGA's knowledge about contamination on the Property, although not relevant to the Sellers' duties under the Second Amendment, is potentially relevant to AGA's breach of warranty claim under the Agreement. Although counterclaim defendants cite no cases relating to the effect of AGA's prior knowledge of the contamination, there is support for the view that under New York law [13] a buyer's knowledge about facts constituting a breach of the seller's warranty at closing could foreclose the buyer from later asserting the breach.

In *CBS Inc. v. Ziff–Davis Publishing Co.*, 75 N.Y.2d 496, 554 N.Y.S.2d 449, 553 N.E.2d 997 (1990), the New York Court of Appeals addressed whether a claim alleging breach of an express warranty required a showing of reliance. The parties had entered into a contract for the sale of certain businesses, and the seller expressly warranted the truthfulness of previously supplied financial information. Pursuant to the contract, the buyer conducted its own investigation, which led it to believe that the warranted information was untrue. The seller dismissed as meritless the buyer's disbelief about the financial information and insisted that the sale go

---

13. The Agreement provides that it "shall be construed and enforced in accordance with the laws of the State of New York." (Muller–Thym Aff., Ex. E, ¶ 24)

through. The Court rejected the seller's argument that to succeed on a breach of express warranty claim the buyer must show a belief in the truth of the representations made in the warranty and a change of position in reliance on that belief. The Court held: "The critical question is not whether the buyer believed in the truth of the warranted information, ... but 'whether [it] believed [it] was purchasing the [seller's] promise [as to its truth].'" 75 N.Y.2d at 503, 554 N.Y.S.2d 449, 553 N.E.2d 997 (quoting *Ainger v. Michigan General Corp.*, 476 F.Supp. 1209, 1225 (S.D.N.Y.1979)).

However, the Second Circuit, applying New York law in *Galli v. Metz*, 973 F.2d 145 (2d Cir.1992), addressed the limits of *Ziff–Davis*. The Court said: "Where a buyer closes on a contract in the full knowledge and acceptance of facts disclosed by the seller which would constitute a breach of warranty under the terms of the contract, the buyer should be foreclosed from later asserting the breach. In that situation, unless the buyer expressly preserves his rights under the warranties ... we think the buyer has waived the breach." *Id.* at 151. In *Galli*, the sellers had warranted that they did not "know or have reason to be aware of any facts which might result in any ... claim ... which might adversely affect the business or condition ... of [the corporation] or its properties." *Id.* at 150. In fact, there was hazardous waste on a piece of property operated by one of the companies sold to the buyer. The Court held that whether the buyer's knowledge of the contamination "vitiates his warranty breach claim depends on the circumstances in which [he] learned of the problem," *id.* at 151, and remanded for further factfinding. The Court instructed that if the sellers disclosed the problem to the buyer, then the "sellers would have a strong argument that [the buyer] waived the warranties." *Id.* However, if the buyer learned of the

problem from a third party, then the buyer might have "purchased the sellers' warranty as insurance against any future claims" and the buyer could win his breach of warranty claim. *Id.*

In *Rogath v. Siebenmann*, 129 F.3d 261 (2d Cir.1997), the Second Circuit, discussing *Galli*, said that "if the seller is not the source of the buyer's knowledge, e.g., if it is merely 'common knowledge' that the facts warranted are false, or the buyer has been informed of the falsity of the facts by some third party, the buyer may prevail in his claim for breach of warranty." *Id.* at 265. "In these cases, it is not unrealistic to assume that the buyer purchased the seller's warranty 'as insurance against any future claims,' and that is why he insisted on the inclusion of the warranties in the bill of sale." *Id.* (quoting *Galli*, 973 F.2d at 151). The Court concluded: "In short, where the seller discloses up front the inaccuracy of certain of his warranties, it cannot be said that the buyer—absent the express preservation of his rights—believed that he was purchasing the seller's promise as to the truth of the warranties. Accordingly, what the buyer knew and, most importantly, whether he got that knowledge from the seller are the critical questions." *Id.* at 265.

*Galli* and *Rogath* provide support for the argument that AGA's knowledge of certain problems with the Property prior to the closing of the sale would foreclose AGA's breach of warranty claims if these problems were disclosed by the Sellers prior to closing and AGA did not expressly reserve its rights.

However, there is no evidence that AGA had knowledge of the 500–gallon UST or improper removal of the 2000–gallon UST before the purchase. The Sellers warranted under Paragraph 14(p)(2) of the Agreement that except as disclosed in Schedule 18, no property owned by Sellers "contains

or has contained any underground storage tank." Schedule 18 did not disclose the presence of the 500–gallon tank that URS discovered in 2001, thus the Sellers breached this warranty. AGA had no knowledge of the presence of this tank and cannot be said to have waived this warranty. It is also undisputed that AGA had no knowledge prior to the sale of the Property that the 2000–gallon UST had been improperly removed. The Sellers warranted that "[a]ny underground storage tank removed from the Mt. Vernon Location was removed in accordance with Environmental law;" however, URS found that the pipe was not removed or capped as required by law. This was a breach of warranty, and there was no waiver of the claim by AGA.

The more complicated question is whether AGA's knowledge prior to the sale of the Property about low concentrations of contaminants forecloses AGA's breach of warranty claim based on the presence of these contaminants. The Sellers represented and warranted under Paragraph 14(p)(1) that "no Contaminant has been disposed of, generated on, treated on, buried beneath, or percolated beneath, and no disposal, generation, treatment, burial or percolation has been threatened in or near any real property previously or currently owned, leased or used by Sellers." In 2001, AGA found petroleum, defined as a

"Contaminant" under the agreement, in soil and groundwater on the Property and incurred costs in removing it.

Before it bought the Property, AGA knew from both URS's 1996 report and the report by Trade–Winds that there were low levels of contamination on the Property. Under *Galli*, if the seller discloses that a warranty is false before the closing, and the buyer goes ahead with the sale without expressly reserving his rights, then the buyer has waived the warranty. Information given to AGA by Trade–Winds might be considered information disclosed by the Sellers because Trade–Winds was hired by the Sellers. However, Trade–Winds investigated only part of the Property—the MB–2 site. This site, to the East of the loading platform, was not an area excavated by URS in 2001 and thus any information disclosed by Trade–Winds is not relevant to the current dispute.

URS's 1996 report, on the other hand, revealed that there were low concentrations of contaminants in the areas where URS later excavated in 2001. In 1996, URS reported there was contamination at the MB–1, in the area of the former 2000–gallon UST, and at the MB–3 site, which was in the general vicinity where the 500–gallon UST was later discovered.[14]

---

**14.** Counterclaim defendants' statement that "[a]ny contamination encountered during the 2001 excavation of the site was known to have existed by AGA prior to the closing of title in 1996 and remained virtually unchanged from that time on" (Counterclaim Def.'s Mem. at 6), is not precisely true.

The 1996 URS report revealed that there were low concentrations of VOCs at the MB–1 site. These concentrations were well below the NYSDEC Soil Cleanup Objectives. The 1996 Report also showed DROs and GROs at both the MB–1 and MB–3 sites. According to the report, there were no NYSDEC Soil Cleanup Objectives for these contaminants.

(Muller–Thym Aff., Ex. G, tab. 4) The concentrations were low enough that URS did not recommend remediation. In 2001, ATC reported contamination above the NYSDEC Recommended Soil Cleanup Objectives ("RSCOs") in the area of the former 2000–gallon UST, and in the vicinity of where the 500–gallon UST was later found. (Muller–Thym Aff., Ex. J, at 28) Assuming that the RSCOs did not change between 1996 and 2001—an issue neither party address—in 2001 AGA learned there was more contamination present on the Property than it previously had thought.

However, because URS was hired by AGA, the Sellers cannot argue that they disclosed the contamination to AGA, and they cannot argue that AGA waived any breach of warranty. *See Rogath v. Siebenmann,* 129 F.3d 261, 265 (2d Cir.1997); *see also Promuto v. Waste Management, Inc.,* 44 F.Supp.2d 628, 648–49 (S.D.N.Y.1999) ("The law is clear that in order to conclude that plaintiffs have waived their right to assert a claim for breach of warranty, we must find that, prior to closing, defendants themselves actively disclosed to plaintiffs facts which would have constituted a breach of the warranties under the terms of the Exchange Agreement.... [A]ny information about WMX's accounting policies that plaintiffs' may have gained either through their own efforts, 'common knowledge' or third party communications is wholly irrelevant...."); *Coastal Power Int'l, Ltd. v. Transcon. Capital Corp.,* 10 F.Supp.2d 345, 361 (S.D.N.Y.1998) ("[The Second Circuit in *Rogath* ] made clear its view that a buyer, under New York law, waives any claim for breach of warranty if the buyer is aware, by reason of the seller's disclosure, of facts constituting a breach but closes without expressly reserving his rights to enforce the agreement. The buyer's awareness of such facts from other sources, however, creates no such difficulty." (footnotes omitted)).

Counterclaim defendants have failed to point to disputed facts that, if resolved in their favor, would defeat AGA's breach of warranty and indemnification claim under the Agreement. The Sellers warranted that there was no petroleum on the Property and AGA incurred costs to remove petroleum contamination. Therefore, Sellers are liable for these costs under the Agreement. They are also liable under the Agreement for the costs associated with the 500–gallon UST and correcting the improper removal the 2000–gallon UST, as the Sellers warranted that there

was no UST on the Property and that any prior UST had been removed properly.

In addition to the cost of the remediation of the Property, AGA requests an "unknown sum to be established at the time of trial" for 1) the loss of the sale of the Property to Town Holding due to the pollution conditions at the Property; 2) diminution in the value of the Property as a result of the pollution conditions at the Property; and 3) attorneys' fees and other litigation expenses.

Counterclaim defendants do not address whether AGA can recover such damages. There is considerable doubt as to whether AGA could recover attorney fees under either indemnity provision. *See Hooper Assocs., Ltd. v. AGS Computers, Inc.,* 74 N.Y.2d 487, 492, 549 N.Y.S.2d 365, 367, 548 N.E.2d 903 (1989) ("Inasmuch as a promise by one party to a contract to indemnify the other for attorney's fees incurred in litigation between them is contrary to the well-understood rule that parties are responsible for their own attorney's fees, the court should not infer a party's intention to waive the benefit of the rule unless the intention to do so is unmistakably clear from the language of the promise."). However, as AGA has not moved for summary judgment as to these damages, and neither party has addressed these issues in its papers, I will not decide now which damages AGA can attempt to prove.

\*    \*    \*    \*    \*    \*

For the reasons stated above, AGA's motion for summary judgment is granted as to liability. The parties will attend a conference on April 4, 2003, to discuss resolution of damages issues and the status of the Armentanos' claims.